## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

GunBroker.com, LLC )
)
   Plaintiff, )
)
v. )    Case No.  1:20-cv-00613-TWT
)
Tenor Capital Partners, LLC, )
)
   Defendant )
)
)

## AMENDED COMPLAINT FOR RESCISSION AND DAMAGES

COMES NOW GUNBROKER.COM, LLC, Plaintiff in the above-styled

action, by and through undersigned counsel, and pursuant to Fed. R. Civ. P.

15(a)(1) & (2) hereby files this Amended Complaint for Rescission and Damages,

respectfully showing this Honorable Court the following:

## INTRODUCTION

1.

This Action arises from Plaintiff GunBroker.com. LLC's (hereinafter

"Plaintiff" or "GunBroker" or the "Company") effort to explore the possibility of

creating an employee stock ownership plan ("ESOP").  In connection therewith,

Plaintiff sought qualified investment advice relating to this complicated financial transaction.  In that regard, Defendant Tenor Capital Partners, LLC (hereinafter "Tenor") falsely represented that it was qualified to assist GunBroker in that endeavor.

2.

To induce GunBroker to pursue an ESOP transaction, Tenor and its principals Todd Butler and Andre Schnabl represented to Steve Urvan, the Chief Executive Officer of GunBroker, that the enterprise valuation of GunBroker was potentially as high as $200,000,000 and that an ESOP transaction made financial sense given the projected valuation.   Mr. Butler was known to Mr. Urvan because he was a lawyer and had previously worked at a law firm that had provided legal services to GunBroker.   Mr. Butler played on his status as a lawyer and even presented key documents to Mr. Urvan labeled as "Confidential Protected by Attorney-Client Privilege."

3.

Based on upon Tenor's false representations, Plaintiff entered into a letter agreement with Tenor pursuant to which Tenor agreed to provide GunBroker the required investment advice(hereinafter the "Letter Agreement" or "October 16, 2018 Letter Agreement").   Unfortunately, Tenor was not qualified to provide the

required investment advice because Tenor had failed to register with the United States Securities and Exchange Commission either as an Investment Advisor pursuant to the Investment Advisor Act of 1940 or, alternatively, as a broker-dealer pursuant to the Securities Exchange Act of 1934.

4.

In any case, in an effort to encourage GunBroker to pursue an ESOP Transaction and continue the engagement beyond the initial Analysis and Structuring Stage, and after commencing the engagement and purportedly based upon Tenor's review of GunBroker's financial information, Tenor falsely misrepresented to GunBroker that Tenor's preliminary valuation work indicated that the Company had a current enterprise value of at least $180,000,000. In reasonable reliance on Tenor's representations and as a direct and proximate result of Tenor's false representations, GunBroker continued with the engagement and incurred hundreds of thousands of dollars in unnecessary costs and expenses pursuing an ESOP transaction before GunBroker was informed that the "best-case" valuation of the Company was at least $40 million less than what Tenor had represented.

5.

In February 2019 as the work on creating the ESOP was commencing in earnest, Plaintiff's principal, Steve Urvan, requested that Tenor confirm that Tenor was in compliance with the federal securities laws.   Specifically, Mr. Urvan requested confirmation that Tenor was properly registered with the Securities and Exchange Commission or alternatively, Mr. Urvan requested an explanation regarding how and why Tenor believed it was not required to register with the Securities and Exchange Commission to provide the requested investment advice. Tenor refused to answer the question and instead simply ceased working on the engagement.   Although no formal termination letter was ever sent by either party, Tenor's failure to provide the requested confirmation or explanation and concurrent abandonment of the engagement, effectively terminated the Letter Agreement and the business relationship between Tenor and GunBroker.

6.

Despite Tenor's abandonment of the project, GunBroker continued with the engagement of an ESOP trustee, a valuation firm to advise the ESOP trustee regarding the fair market value and enterprise valuation of GunBroker, and various lawyers and financiers to assist GunBroker in acheiving its goal to execute an

ESOP transaction.   At the end of April 2019 and in May 2019, the ESOP trustee

presented GunBroker with multiple non-binding term sheets which were premised

upon an enterprise value of GunBroker of between $100,000,000 and

$140,000,000 respectively.   Tenor had misrepresented the value of GunBroker by

more than 22%, a $40,000,000 difference.   Given the true valuation range of the

Company, the ESOP transaction was abandoned, but GunBroker incurred more

than $775,000.00 in failed transaction costs.   Instead, GunBroker closed a

$65,000,000 non-ESOP related credit facility with the third party lender which

happened to have been involved in this failed ESOP transaction.

7.

Now, long after the business relationship ended, Tenor contends that the terms

of the aborted Letter Agreement provide that Tenor should receive $1,050,000 as a

purported "success" fee because Plaintiff closed a credit facility with this third party

lender, MGG Investment Group (hereinafter "MGG").   MGG was introduced to

Plaintiff by another third party investment bank and the introduction had nothing to

do with Tenor.   Furthermore, the credit facility which MGG ultimately provided had

nothing to do with an ESOP transaction which was the only basis that Tenor was

engaged to provide investment advice to Plaintiff in the first place.   Finally, the Letter

Agreement expressly provides that if the enterprise valuation of GunBroker is less

than $165,000,000, Tenor is not entitled to any fee.

8.

Nevertheless, the Letter Agreement is void *ab initio* and Plaintiff has an

absolute right to rescind the Letter Agreement in its entirety.  The United States

Supreme Court in *Transamerica Mortgage Advisors, Inc. (TAMA), et al. v. Lewis*,

444 U.S. 11 (1979) confirmed that a contract made in violation of the requirements of

the Investment Advisors Act of 1940 (which would include the prerequisite of

registering as an investment advisor with the S.E.C.) is void *ab initio* and subject to

rescission.   Alternatively, Tenor was required to register as a broker-dealer pursuant

to Section 15 of the Securities Exchange Act of 1934 and because Tenor failed to

register as a broker-dealer, Plaintiff is entitled to rescind the Letter Agreement.  The

parallel provisions of the Georgia Securities Act likewise provide Plaintiff with the

absolute right to rescind the Letter Agreement.

### THE PARTIES

9.

Plaintiff, GunBroker.com, LLC (hereinafter "GunBroker" or "Plaintiff"), is

a Delaware limited liability company with its principal place of business located in

Cobb County, Georgia.  Plaintiff is properly registered and licensed to do business

in this State, is subject to the jurisdiction of this Court, and otherwise has standing to bring the attendant claims against the named Defendant.

10.

Defendant Tenor Capital Partners, LLC (hereinafter "Tenor") is a Georgia limited liability company with a principal office address of 1266 West Paces Ferry Road, Suite 419, Atlanta, Georgia 30327-2306.   Tenor may be served with a second original of this Complaint and Summons through its registered agent, J. Todd Butler, at its principal office address, or by any other means proper pursuant to the Federal Rules of Civil Procedure.

**JURISDICTION AND VENUE**

11.

This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §1331, because Plaintiff's claims are primarily premised upon violations of two federal statutes:  the Investment Advisors Act of 1940 and the Securities Exchange Act of 1934.  The Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 for the state law claims because the claims are so related to the federal claims in the action that they form part of the same case or controversy.

12.

Venue is proper in proper in the Northern District of Georgia pursuant to 28 U.S.C. §1391, because the Defendant is a resident of the state of Georgia and has its principal place of business in the state of Georgia and within the Northern District of Georgia.  Furthermore, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Georgia.

## GENERAL ALLEGATIONS COMMON TO ALL CLAIMS

13.

Plaintiff incorporates by reference and re-alleges each allegation contained in Paragraphs 1 through 12 above, as if contained herein.

14.

Steve Urvan, the Chief Executive Officer of Plaintiff, was introduced to Tenor Capital Partners LLC ("Tenor") and its principals, Todd Butler and Andre Schnabl, in 2018.  Tenor describes itself on its website as a "boutique investment bank and financial advisor" and as "ESOP Leveraged Buyout Specialists."  Todd Butler has a background as an ESOP lawyer and was a partner with at least two national law firms, FisherBroyles LLP and Holland and Knight LLP.  The other principal of Tenor, Andre Schnabl is an accountant by trade and is the former

managing partner of the accounting firm Grant Thornton LLP. FisherBroyles LLP had provided legal services to GunBroker, and Mr. Urvan was familiar with Mr. Butler from his time as a member of that law firm.

15.

After discussing the potential benefits of an ESOP transaction and persuading Mr. Urvan that pursuing such a transaction made business sense, Mr. Butler prepared a letter dated October 16, 2018 (the "Letter Agreement") which purported to outline the terms pursuant to which Tenor would provide "limited financial advisory services" relating to the "potential installation of an employee stock ownership plan and the financing thereof." A copy of the October 16, 2018 Letter Agreement is attached hereto as Exhibit A. A key representation made by Mr. Butler to induce Mr. Urvan to sign the Letter Agreement was the representation that GunBroker's enterprise valuation was in excess of $165,000,000 and could be as high as $200,000,000. Although the first draft of the Letter Agreement conveniently excluded any valuation benchmark, Mr. Urvan insisted that the Letter Agreement expressly provide that Tenor is not entitled to any fee if the enterprise valuation of GunBroker is less than $165,000,000.

16.

In connection with the execution of the Letter Agreement, Tenor did not
provide Plaintiff with a S.E.C. Form ADV Disclosure Statement before, after or in
connection with providing Plaintiff with the Letter Agreement.  Indeed, Tenor has
never provided Plaintiff with a Form ADV, and, on information and belief, Tenor
has never created a Form ADV or provided this legally required disclosure
document to any of its clients.

17.

The Letter Agreement states, "The Company [Plaintiff] hereby engages
Tenor to provide the limited financial advisory services described below to the
Company and its shareholders in connection with the Company's (or an affiliate or
subsidiary of the Company to be determined which if applicable shall also be
referred to herein as the "Company") potential installation of an employee stock
ownership plan and the financing thereof (the "Transaction")."

18.

The Letter Agreement further provided that Tenor would provide investment
advisory services in three (3) stages: (1) Analysis and Structuring Stage; (2)
Financing Raise Stage; and (3) Closing Stage.   The specific investment advisory

services that Tenor was promising to provide during stages 1 and 2 included, *inter alia*, the following:

(a)   Assist the Company and Shareholders to identify strategic objectives;

(b)   Collect data, financial and otherwise from the Company;

(c)   Conduct a high-level assessment of the tax issues relevant to the Transaction;

(d)   Perform a preliminary, oral valuation of the Company;

(e)   Design transaction alternatives to address strategic objectives;

(f)   Consider the financial and tax implications of alternative transaction structures to the Company and the selling shareholders;

(g)   Develop an explanatory analysis of the Transaction which will include a ten-year financial model providing the cash flows resulting from the Transaction and comparison(s) of alternative transactions;

(h)   Review the Company's financial statements in order to evaluate financing options for the Transaction;

(i)   Prepare a descriptive financing memorandum, to be used in discussions with lenders (including institutions with whom the Company currently has relationships);

(j)     Contact banks and financial institutions regarding financing the

transaction, arrange lender meetings, solicit proposals, assist in

negotiating the final terms of the lending agreements and Transaction,

and assist in closing the Transaction;

(k)     Provide other financial advisory services as needed and requested as

necessary to assist the Company in obtaining financing for the

Transaction.

19.

As compensation for providing services to Plaintiff, the Letter Agreement

provided for the payment of a $12,500.00 "Structuring Stage Fee" to compensate

Tenor for their preliminary analysis and work during stage 1.  If the Company

decided to continue to stage 2 and 3, the Letter Agreement provided a formula

pursuant to which Tenor could earn a "TCP Success Fee" for the additional

investment advisory services that they provided in connection with the closing of

an ESOP transaction.

20.

Mr. Urvan executed the Letter Agreement in his capacity as the Chief

Executive Officer of Plaintiff and caused Plaintiff to pay to Tenor the $12,500.00

"Structuring Stage Fee."  Mr. Todd Butler executed the Letter Agreement in his capacity as the Managing Partner of Tenor.

21.

The Investment Advisors Act of 1940 defines an "investment advisor" as, "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; …"  The definition of an investment advisor proceeds to outline eight (8) exclusions to the definition of an "investment advisor," none of which are pertinent here.

22.

By its plain terms, Tenor was agreeing to act as an "investment advisor" to Plaintiff for compensation.  Tenor was advising Plaintiff regarding the fair valuation of Plaintiff's stock and advising Plaintiff whether or not to sell its stock to an employee stock ownership plan which Tenor promised to help create.  Tenor promised to help Plaintiff "identify strategic objectives," assess tax issues and provide an "oral valuation of the Company" which by definition is an oral report and analysis of the value of the Company's stock.  Furthermore, in stage 2, Tenor

promised to create a "ten-year transaction financial model providing the cash flows resulting from the Transaction and comparison(s) to alternative transactions." Moreover, Tenor promised to provide any "other financial advisory services as needed."

23.

After the Letter Agreement was executed and the Structuring Stage fee was paid, Tenor began providing the services outlined in the Letter Agreement.   In late November 2018, Tenor presented GunBroker with a PowerPoint presentation dated November 19, 2018 labeled "Confidential Protected by Attorney-client Privilege ESOP and Alternative Transactions Analysis."  On page 10 of this presentation, Tenor represented to GunBroker, "Preliminary valuation work indicates the Company has a current enterprise value of at least $180 million."  In reasonable reliance upon this representation and confirmation that the enterprise valuation of the Company was in excess of the $165,000,000 benchmark, GunBroker authorized Tenor to proceed to the next stage of the engagement.

24.

In February 2019, the process of establishing an ESOP was proceeding in earnest and various additional professionals were being engaged to facilitate the transaction.   GunBroker would be responsible for paying the professional fees for

each of these professionals until the conclusion of the transaction.  Tenor identified

a lawyer named Quentin Lynch at the firm Smith Lynch LLC to provide legal

services in connection with the transaction.  Mr. Urvan questioned Mr. Lynch's

involvement because Mr. Urvan reasonably expected that the legal services would

be provided by Tenor, through Mr. Butler, a practicing lawyer.   In response, Mr.

Butler informed Mr. Urvan that he and Tenor were functioning as an "investment

banker," not as a lawyer.

25.

Mr. Urvan subsequently asked Mr. Butler for confirmation that Tenor was in

full compliance with the federal and state securities laws either through proper

registration or an assurance that Tenor was operating under an appropriate S.E.C.

exemption to registration.   Mr. Butler failed to provide a confirmation that Tenor

was in compliance with all applicable federal and state securities laws, and instead

Tenor stopped providing investment advice to Plaintiff and Tenor performed no

further work on behalf of Plaintiff.  The Letter Agreement was effectively

terminated although neither party formally sent a termination letter.

26.

In March, April and May 2019, based upon its reasonable reliance on

Tenor's prior work indicating an enterprise value of at least $180,000,000,

- 15 -

GunBroker continued to explore the possibility of an ESOP transaction without any additional financial advice from Tenor. At the end of April 2019 and continuing into May 2019, the ESOP trustee presented GunBroker with several different non-binding term sheets. The first non-binding ESOP term sheet was premised upon an enterprise value of GunBroker of $100,000,000 and the final non-binding ESOP term sheet was premised upon an enterprise valuation of $140,000,000. The ESOP Trustee had determined the enterprise value of GunBroker to be more than 22% less (a $40,000,000 difference) than Tenor had represented. Given the true valuation range, GunBroker had no choice but to abandon the ESOP transaction, and GunBroker lost more than $775,000 in failed transaction costs.

27.

GunBroker determined that an ESOP Transaction was not feasible and stopped pursuing an ESOP Transaction. Instead, Plaintiff closed a $65,000,000.00 credit facility with MGG. The $65,000,000.00 credit facility had nothing to do with an ESOP Transaction. Moreover, another investment banker introduced MGG to Plaintiff; Tenor did not make the introduction. As part of the efforts relating to a possible ESOP Transaction, Plaintiff provided the name of MGG to Tenor so that MGG could be included as a potential financier for the contemplated,

but never consummated, ESOP Transaction.  Thus, MGG had been included as a

possible participant in a proposed ESOP transaction and had communications with

Tenor, but Tenor did not introduce MGG to Plaintiff and cannot claim to be the

originating source of that relationship.

28.

On or about October 11, 2019, Tenor sent Plaintiff an invoice purporting to

demand a $1,050,000.00 fee owed pursuant to the terms of the Letter Agreement.

Plaintiff understands that Tenor contends that it is entitled to this fee pursuant to

the language in Paragraph 15 of the Letter Agreement.

29.

The pertinent language of Paragraph 15 of the Letter Agreement states as

follows:

> To protect Tenor's intellectual property and to provide adequate
> consideration for the performance of its services hereunder, if the
> Company, or any subsidiary of affiliate thereof, within twelve (12)
> months of the termination of this engagement, closes any transaction
> involving the sale of shares to an ESOP or a financing transaction
> with any lender introduced to the Company or its shareholders, the
> Company will be obligated to pay the TCP Success Fee calculated
> under Section 3(b), or, if TCP [Tenor] is not required by the Company
> to perform a financing raise, 3(c) of this Agreement.  If for any reason
> the enterprise valuation of the Company as determined by the ESOP
> trustee is less than $165 million dollars and the Company determines
> not to close an ESOP transaction at such lower valuation, TCP
> [Tenor] shall have no right to payment under this paragraph.

30.

Tenor is not entitled to payment pursuant to Paragraph 15 of the Letter Agreement because the facts will demonstrate that:

1) No ESOP Transaction was ever closed;

2) The enterprise valuation of Plaintiff was less than $165 million dollars; and

3) Tenor did <u>not</u> introduce MGG to Plaintiff.

Pretermitting that the facts outlined above demonstrate that Tenor cannot demonstrate the conditions precedent to be entitled to a "success fee" under the terms of the Letter Agreement, Tenor has no legal rights pursuant to the Letter Agreement at all because the Letter Agreement is void ***ab initio*** because Tenor failed to comply with the requirements of the Investment Advisor Act of 1940 and/or the Securities Exchange Act of 1934. Thus, as a matter of law, no contract ever existed between Plaintiff and Tenor.

31.

Plaintiff formally exercises its legal right to rescind the Letter Agreement and demands that Tenor return to Plaintiff all compensation paid to Tenor under the terms of the Letter Agreement, including but not limited to the $12,500.00 Structuring Stage Fee.

- 18 -

**CAUSES OF ACTION**

**COUNT I: VIOLATION OF THE INVESTMENT ADVISOR ACT OF 1940**

32.

Plaintiff incorporates by reference and re-alleges each allegation contained in Paragraphs 1 through 31 above, as if contained herein.

33.

The Investment Advisers Act of 1940 defines an "investment adviser" as any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who for compensation and as part of a regular business, issues or promulgates analysis or reports concerning securities.

34.

Section 203 of the Investment Advisors Act provides that it shall be unlawful for any investment advisor, unless registered under this section, to make use of the mails or any means or instrumentality of interstate commerce in connection with his or its business as an investment adviser.

35.

The Defendants have repeatedly acted as an investment adviser as defined by the Investment Advisers Act of 1940 in their business transactions with the Plaintiff.

36.

Section 206 of the Investment Advisers Act of 1940 provides that it shall be unlawful for any investment adviser, by use of the mails or any means or instrumentalities of interstate commerce, directly or indirectly:

(1)   to employ any device, scheme, or artifice to defraud any client or prospective client;

(2)   to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

(3)   acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as a broker for a person other than such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction.  The prohibitions of this paragraph (3) shall not apply to any transaction with a customer of a broker or dealer is such broker or

dealer is not acting as an investment adviser in relation to such transaction; or

(4)   to engage in any act, practice, or course of business which is fraudulent, deceptive or manipulative.   The Commission shall, for purposes of this paragraph 4 by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive or manipulative.

37.

Defendants have engaged in acts, practices and have conducted their business in a manner that constitutes a course of business that operates or would operate as a fraud or deceit upon another person in violation of Section 206(2) of the Investment Advisers Act of 1940 as more fully described above in Paragraphs 1 through 8 and Paragraphs 13 through 31 above.

38.

Plaintiffs invoke their right to rescind the Letter Agreement based upon the clear violations of the Investment Advisors Act of 1940.

39.

As a direct and proximate result of Defendant's violations of the Investment Advisers Act of 1940, Plaintiff has suffered damages in an amount to be proven at trial.

### COUNT II:   VIOLATION OF SECTION 15 OF THE SECURITIES EXCHANGE ACT OF 1934

40.

Plaintiff incorporates by reference and re-alleges each allegation contained in Paragraphs 1 through 39 above, as if contained herein.

41.

The actions, activities and course of business of Defendants as more fully described in Paragraphs 1 to 31 above, constitute the business activities of a broker-dealer as defined by the Securities Exchange Act of 1934 and the Securities and Exchange Commission.

42.

The Securities Exchange Act of 1934 defines a broker as "any person engaged in effecting transactions in securities for the account of others, but does not include a bank."   In proposing to facilitate an ESOP transaction whereby

Plaintiff would sell stock shares to an ESOP, Tenor was acting as a statutory broker.

43.

As a statutory broker, Defendants are required to comply of the provisions of Section 15 of the Securities Exchange Act of 1934 and obtain and maintain an appropriate broker-dealer registration.

44.

Defendants have repeatedly and consistently violated the provisions of Section 15 of the Securities Exchange Act of 1934.

45.

Based upon Defendant's violations of Section 15 of Securities Exchange Act of 1934, Plaintiff has a right to rescind the Letter Agreement.

46.

Plaintiffs invoke their right to rescind the Letter Agreement based upon the clear violations of the Securities Exchange Act of 1934.

47.

As a direct and proximate result of Defendant's violations of the Securities Exchange Act of 1934, Plaintiff has suffered damages in an amount to be proven at trial.

### COUNT III: VIOLATION OF THE GEORGIA SECURITIES ACT: FAILURE TO REGISTER AS AN INVESTMENT ADVISOR

48.

Plaintiff incorporate by reference and re-allege each allegation contained in Paragraphs 1 through 47 above, as if contained herein.

49.

O.C.G.A. § 10-5-2 defines as "investment advisor" substantially the same way that an investment advisor is defined by the federal Investment Advisor Act of 1940.

50.

An entity, like Defendant here, that satisfies the definition of an investment advisor pursuant the Georgia Securities Act must comply with either O.C.G.A. §10-5-32 or O.C.G.A. §10-5-34, respectively.   Tenor meets the statutory definition and is an "investment advisor," but Tenor has complied with neither O.C.G.A. §10-5-32 nor O.C.G.A. §10-5-34.

51.

None of the exemptions contained in O.C.G.A. §§10-5-32(b) or 10-5-34(b) are applicable to Tenor.

- 24 -

52.

O.C.G.A. §10-5-58(k) states, "A person that has made or has engaged in the performance of a contract in violation of this chapter or a rule adopted or order issued under this chapter or that has acquired a purported right under the contract with knowledge of conduct by reason of which its making or performance was in violation of this chapter may not base an action on the contract."   Based upon this provision, Plaintiff has a right to rescind the Letter Agreement for Tenor's violation of the Georgia Securities Act.

53.

Defendant's failure to register as an investment advisor either as required by the Investment Advisor Act of 1940 or pursuant to O.C.G.A. §10-5-32 constitutes a device, scheme or artifice to defraud and/or constitutes an act, practice or course of business that operated as a fraud on Plaintiff.   Thus, Defendant's conduct also violates O.C.G.A. §10-5-51.

54.

As a direct and proximate result of Defendant's violations of the Georgia Uniform Securities Act and pursuant to O.C.G.A. §10-5-58(e)&(f), Plaintiff also has right to recover the consideration paid for the advice, interest from the date of payment, costs and reasonable attorney fees determined by the Court.

## COUNT IV:  VIOLATION OF THE GEORGIA SECURITIES ACT: FAILURE TO REGISTER AS A BROKER-DEALER

55.

Plaintiff incorporates by reference and re-alleges each allegation contained in Paragraphs 1 through 54 above, as if contained herein.

56.

O.C.G.A. § 10-5-2 defines as "Broker-dealer" as a person engaged in the business of effecting transactions in securities for the account of others or for the person's own account."   The definition has certain exceptions not pertinent here.

57.

An entity, like Defendant here, that satisfies the definition of an Broker-dealer pursuant the Georgia Securities Act must comply with O.C.G.A. §10-5-30 unless one of the exceptions outlined in O.C.G.A. §10-5-30(b) applies.   Tenor meets the statutory definition as a "Broker-dealer," and none of the exceptions of O.C.G.A. §10-5-30(b) apply.

58.

O.C.G.A. §10-5-58(k) states, "A person that has made or has engaged in the performance of a contract in violation of this chapter or a rule adopted or order issued under this chapter or that has acquired a purported right under the contract

- 26 -

with knowledge of conduct by reason of which its making or performance was in violation of this chapter may not base an action on the contract."   Based upon this provision, Plaintiff has a right to rescind the Letter Agreement for Tenor's violation of the Georgia Securities Act.

59.

Defendant's failure to register as a "Broker-dealer" pursuant to O.C.G.A. §10-5-30 constitutes a device, scheme or artifice to defraud and/or constitutes an act, practice or course of business that operated as a fraud on Plaintiff.   Thus, Defendant's conduct also violates O.C.G.A. §10-5-50.

60.

As a direct and proximate result of Defendant's violations of the Georgia Uniform Securities Act and pursuant to O.C.G.A. §§10-5-58(d)&(f), Plaintiff also has right to recover the consideration paid for the advice, interest from the date of payment, costs and reasonable attorney fees determined by the Court.

COUNT V: BREACH OF CONTRACT

61.

Plaintiff incorporates by reference and re-alleges each allegation contained in Paragraphs 1 through 60 above, as if contained herein.

62.

Although GunBroker contends that the October 16, 2018 Letter Agreement is void *ab initio*, GunBroker hereby pleads in the alternative that to the extent the October 16, 2018 Letter Agreement is determined to be a valid and enforceable contract, Tenor breached that contract by abandoning the engagement at the end of February 2019.

63.

On or about February 26, 2019, GunBroker through its Chief Executive Officer Steve Urvan asked a valid, legitimate and reasonable question which was phrased as follows:

> My attorneys asked me to ask you about your broker dealer license, or more specifically apparent lack thereof. They have been unable to verify that Tenor Capital Partners LLC or its principals has the proper licenses. They asked me to ask you if Tenor is licenses, or if there is an exception from registration applicable to your business. If operating on an exception, they will need info to verify the validity of the exception.

Rather than respond to this question or engage in a dialogue with their client, Tenor proceeded to abandon the project. Andre Schnabl called the Director of GunBroker's parent corporation begging to be released from further obligations pursuant to the October 16, 2018 Letter Agreement. Todd Butler left a voice message and sent a follow up email communication falsely asserting that

GunBroker had terminated the relationship.   In fact, neither party sent a formal

termination letter.  Tenor, however, stopped providing any services to GunBroker.

64.

Nevertheless, GunBroker continued to explore a potential ESOP

transaction based upon Tenor's November 2018 representation that the

enterprise valuation of GunBroker was at least $180,000,000.  To continue

exploring an ESOP transaction, GunBroker had to continue to pay the

professional fees for the ESOP trustee, a valuation firm to assist the ESOP

trustee and various lawyers to provide legal advice relating to the creation of

an ESOP.  Tenor was aware that exploring a potential ESOP transaction

would require incurring these costs.

65.

Beginning at the end of April 2019 and continuing into May 2019, the

ESOP trustee presented GunBroker with several non-binding term sheets for

an ESOP transaction.  The initial non-binding ESOP term sheet was

premised upon an enterprise value of GunBroker of $100,000,000.  The final

non-binding ESOP term sheet was premised upon an enterprise valuation of

$140,000,000.   The ESOP Trustee had determined the enterprise value of

GunBroker to be more than 22% less (a $40,000,000 difference) than Tenor

had represented.  Given the drastically lower valuation range, GunBroker

had no choice but to abandon the ESOP transaction.

66.

Tenor's providing of an inaccurate and grossly overstated enterprise

valuation of $180,000,000 for GunBroker in November 2018 constituted a

breach of the October 16, 2018 Letter Agreement.

67.

Tenor's abandonment of the engagement at the end of February 2019

constituted a second, separate and distinct breach of the October 16, 2018

Letter Agreement.

68.

GunBroker is entitled to recover the professional fees paid to the

ESOP trustee, the valuation firm and the other professionals engaged to

pursue the failed ESOP transaction.

## COUNT VI:   FRAUD IN THE INDUCEMENT

69.

Plaintiff incorporates by reference and re-alleges each allegation contained

in Paragraphs 1 through 68 above, as if contained herein.

70.

Tenor induced GunBroker to enter into the October 16, 2018 Letter

Agreement with false representations that the enterprise valuation of GunBroker

could be as high as $200,000,000.   After the engagement began, Tenor further

induced GunBroker to continue past the initial Analysis and Structuring Stage with

another false representation in November 2018 that Tenor's preliminary analysis

showed that the enterprise valuation for GunBroker was at least $180,000,000.

71.

GunBroker reasonably relied upon these representations made by Tenor to

initially sign the October 16, 2018 Letter Agreement and to subsequently authorize

Tenor to proceed past the Analysis and Structuring Stage of the engagement.

72.

GunBroker in further reasonable reliance on Tenor's representations

regarding the enterprise value of GunBroker agreed to incur the financial

responsibility for the professional fees of the ESOP trustee, the valuation firm for

the ESOP trustee and a number of additional professionals as part of the process of

attempting to establish an ESOP.

73.

Tenor intentionally misrepresented the enterprise value of GunBroker to induce Gunbroker to execute the October 16, 2018 Letter Agreement and intentionally misrepresented tenor's qualifications and capabilities to make any determinations regarding GunBroker's enterprise valuation.

74.

Ultimately, because the true enterprise valuation of GunBroker was dramatically less than the valuation that Tenor represented to Gunbroker, GunBroker determined not to proceed with any ESOP transaction.

75.

As a direct and proximate cause of Tenor's fraudulent misrepresentations regarding the enterprise valuation of GunBroker, GunBroker has been damaged in an amount to be determined at trial, but in no event less than the amount of professional fees that GunBroker incurred in pursuing the failed ESOP transaction.

76.

In addition, Tenor's actions were willful, deceitful and demonstrates a callous indifference to the interests of GunBroker.

77.

Tenor acted with specific intent and knowledge that its actions and conduct would have a substantial likelihood of causing financial harm to GunBroker.

78.

Pursuant to O.C.G.A. §51-12-5.1, GunBroker is entitled to punitive damages which are warranted to deter Tenor from repeating the same wrongful conduct in the future.

## COUNT VII: BREACH OF FIDUCIARY DUTY

79.

Plaintiff incorporates by reference and re-alleges each allegation contained in Paragraphs 1 through 78 above, as if contained herein.

80.

Tenor describes itself as a "boutique investment bank and financial advisor" and as "ESOP Leveraged Buyout Specialists." Tenor's principals market and attempt to sell their supposed expertise regarding ESOP transactions in order get business.

81.

In addition, Todd Butler was personally known to GunBroker's CEO Steve Urvan as a lawyer from his time as a member of the FisherBroyles LLP law firm.

Mr. Butler played in this prior relationship and even presented Tenor's work product to Mr. Urvan under the cloak of the attorney client privilege.

82.

Given the totality of the circumstances, GunBroker was justified in reposing the utmost confidence in Tenor. The facts and circumstances created a fiduciary relationship between Tenor and GunBroker.

83.

Tenor breached this fiduciary relationship because Tenor sought to advance its business interests before the business interests of its GunBroker. Tenor specifically breached its fiduciary obligations in the following non-exclusive ways:

(1) Failing to provide an honest assessment of the enterprise value of GunBroker in order to induce GunBroker to proceed past the Analysis and Structuring Stage of the engagement in order to create a situation where Tenor could demand a fee;

(2) Engaging in undisclosed side deal relationships with third parties, including by not necessarily limited to, Quentin Lynch of the law firm of Smith Lynch LLP and, apparently entering into a relationship with a third party to gain access to MGG with whom Tenor had no direct relationship; and

- 34 -

(3)   Failing to disclose to GunBroker that Tenor had made a business decision to operate under the assumption that Tenor had no obligation to register with the federal Securities and Exchange Commission and/or with the Georgia Department of Securities and failing to disclose the potential risks that GunBroker would be assuming by doing business with Tenor under this tenuous assumption,

84.

When GunBroker asked a question regarding Tenor's compliance with applicable federal and state securities laws, Tenor rather than disclosing the basis for Tenor's business decision to proceed under the dubious assumption that it did not have to register as an investment advisor or a broker-dealer, Tenor simply chose to abandon the project and deprive GunBroker of whatever expertise Tenor may possess regarding the proposed ESOP transaction.

85.

As a direct and proximate cause of Tenor's breach of fiduciary regarding the enterprise valuation of GunBroker, GunBroker has been damaged in an amount to be determined at trial, but in no event less than the amount of professional fees that GunBroker incurred in pursuing the failed ESOP transaction.

- 35 -

## COUNT VIII: NEGLIGENT MISREPRESENTATION

86.

Plaintiff incorporates by reference and re-alleges each allegation contained in Paragraphs 1 through 85 above, as if contained herein.

87.

Tenor describes itself as a "boutique investment bank and financial advisor" and as "ESOP Leveraged Buyout Specialists." Tenor's principals market and attempt to sell their supposed expertise regarding ESOP transactions in order get business. Tenor further represented to GunBroker that Tenor had the requisite skills and expertise to determine the enterprise valuation of GunBroker.

88.

In November 2018, Tenor represented to GunBroker that the enterprise value for GunBroker was in excess of $180 million.

89.

In reasonable reliance on Tenor's $180 million enterprise valuation representation, GunBroker proceed with the next steps in pursuing an ESOP transactions including retaining an ESOP trustee, a valuation firm to advise the ESOP trustee and other professionals to provide required services to establish an ESOP.

90.

The ESOP trustee and its valuation firm determined that the enterprise

valuation for GunBroker was no more than $140 million.   This was more than $40

million less than the $180 million enterprise valuation that Tenor had provided to

GunBroker in November 2018.   Because of this 22% discrepancy in the enterprise

valuation of GunBroker, it had to abandon the ESOP transaction.

91.

Tenor has negligent in representing to GunBroker that the enterprise

valuation for GunBroker was $180 million.

92.

As a direct and proximate cause of Tenor's breach of fiduciary regarding the

enterprise valuation of GunBroker, GunBroker has been damaged in an amount to

be determined at trial, but in no event less than the amount of professional fees that

GunBroker incurred in pursuing the failed ESOP transaction.

## COUNT IX:  RECOUPMENT

93.

Plaintiff incorporates by reference and re-alleges each allegation contained

in Paragraphs 1 through 92 above, as if contained herein.

94.

Although GunBroker contends that the October 16, 2018 Letter Agreement is void *ab initio*, GunBroker hereby pleads in the alternative that to the extent the October 16, 2018 Letter Agreement is determined to be a valid and enforceable contract, GunBroker is entitled to recoupment pursuant to O.C.G.A. §§13-7-2, 13-7-12 and 13-7-13.

95.

Pursuant to the October 16, 2018 Letter Agreement, Tenor obligated itself to provide financial advisory services in GunBroker in connect with a proposed ESOP transaction.

96.

In connection with providing financial advisory services to GunBroker, Tenor purportedly determined that the enterprise valuation for GunBroker was $180 million.   Based upon Tenor's valuation, GunBroker determined to proceed with the engagement beyond the Structuring and Analysis Stage of the engagement.

97.

On or about February 26, 2019, Tenor abandoned the engagement and refused to provide any further financial advisory services to GunBroker.

98.

Prior to Tenor's abandonment of the engagement and in reliance upon Tenor's $180 million enterprise valuation, GunBroker had engaged an ESOP trustee, a valuation firm to advise the ESOP trustee and other professionals to assist GunBroker with establishing an ESOP.

99.

Ultimately, the ESOP trustee determined that the enterprise valuation for GunBroker was no more than $140 million.

100.

Based upon the drastically lower enterprise valuation determined by the ESOP trustee and its valuation firm, GunBroker had to abandon the ESOP transaction, after incurring more than $775,000 in ESOP-related transaction costs.

101.

Tenor's representation that the enterprise valuation for GunBroker was at least $180,000,000 was determined either fraudulently or mistakenly.

102.

Regardless of whether Tenor's $180,000,000 enterprise valuation for GunBroker was the product of fraud or mistake, GunBroker incurred the ESOP-

related transaction costs as a direct and proximate cause of Tenor's inaccurate and false enterprise valuation.

103.

Pursuant to O.C.G.A. §§13-7-12 and 13-7-13, GunBroker is entitled to deduct the failed ESOP-related transaction costs in an amount not less than $775,000 from any fee to which Tenor is otherwise entitled (GunBroker denies that Tenor is entitled to any fee) and to the extent that the failed ESOP-related fees incurred by GunBroker are greater than any fee owed to Tenor, GunBroker is entitled to an award of damages in the amount of the excess fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that judgment be entered as follows:

(1)     Rescission of the Letter Agreement and business relationship between Plaintiff and Defendant and a return of Plaintiff to the pre-relationship status quo;

(2)     All other monetary damages including the return of the $12,500.00 payment as permitted by applicable law;

(3)     Damages pursuant to the provisions of O.C.G.A. §10-5-58;

(4)     Damages for Tenor's breach of contract in an amount to be proven at trial;

(5)   Damages for Tenor's fraudulently inducing GunBroker to execute the October 16, 2018 Letter Agreement and to continue beyond the Analysis and Structuring Stage;

(6)   Punitive Damages pursuant to O.C.G.A. §51-12-5. Case No.   1:20-cv-00613-TWT1;

(7)   Damages for Tenor's breach of fiduciary duty in an amount to be proven at trial;

(8)   Damages for Tenor's negligent misrepresentation in an amount to be proven at trial;

(9)   Recoupment pursuant to O.C.G.A. §§13-7-12 and 13-7-13;

(11)   Pre-judgment and post-judgment interest;

(12)   That Plaintiffs recover its reasonable costs and expenses of litigation, including reasonable attorneys' fees; and

(13)   That the Court provide Plaintiffs any and all further relief which it deems just and proper.

Respectfully submitted this 16th day of March, 2020.

Respectfully submitted,

*/s/ John H. Goselin II*
JOHN H. GOSELIN II
Georgia Bar No. 302917

- 41 -

**LITCHFIELD CAVO LLP**
1300 Parkwood Circle SE, Suite 170
Atlanta, GA 30339-2143
Phone: (770) 628-7111
goselin@litchfieldcavo.com

**CULHANE MEADOWS, PLLC**

ASHLEY FILLINGIM
Georgia Bar No. 186005

3330 Cumberland Boulevard
100 City View Suite 500
Atlanta, Georgia 30338
Phone: (404) 606-1650
afillingim@cm.law

*Counsel for GunBroker.com LLC*

# EXHIBIT A



October 16, 2018

*VIA E-MAIL – steve.urvan@geminisouthern.com*

Mr. Steve Urvan
GunBroker.com, LLC
P.O. Box 2511
Kennesaw, GA  30156

Dear Mr. Urvan:

This will confirm the understanding and agreement between Tenor Capital Partners LLC, a
Georgia limited liability company ("Tenor"), and GunBroker.com, LLC (the "Company")
as follows:

1.  The Company hereby engages Tenor to provide the limited financial advisory services
described below to the Company and its shareholders in connection with the Company's (or
an affiliate or subsidiary of the Company to be determined which if applicable shall also be
referred to herein as the "Company") potential installation of an employee stock ownership
plan and the financing thereof (the "Transaction").  This engagement agreement is referred
to herein as the "Agreement".

In connection with this engagement and the Transaction, Tenor agrees to provide the
financial advisory services indicated below in stages solely as authorized and instructed by
the Company (i.e., no fees for subsequent stages will be payable unless the Company
instructs and authorizes Tenor to proceed with the subsequent stage).

(I) Analysis and Structuring Stage:

(a) assist the Company and shareholders to identify strategic objectives;

(b) collect data, financial and otherwise from the Company;

(c) conduct a high-level assessment of tax issues relevant to the Transaction;

(d) perform a preliminary, oral valuation of the Company;

(e) design transaction alternatives to address strategic objectives;

(f) consider the financial and tax implications of alternative transaction structures to the Company and the selling shareholders; and

(g) develop an explanatory analysis of the Transaction which will include a ten-year transaction financial model providing the cash flows resulting from the Transaction and comparison(s) of alternative transactions.

(II) Financing Raise Stage:

(a) review the Company's financial statements in order to evaluate financing options for the Transaction;

(b) prepare a descriptive financing memorandum, to be used in discussions with lenders (including institutions with whom the Company currently has relationships);

(c) contact banks and financial institutions regarding financing the transaction, arrange lender meetings, solicit proposals, assist in negotiating the final terms of the lending agreements and Transaction, and assist in closing the Transaction; and

(d) provide other financial advisory services as needed and requested as necessary to assist the Company in obtaining financing for the Transaction.

(III) Closing Stage:

(a) assemble the team responsible to execute the Transaction and administer the ESOP after closing, including, ESOT (employee stock ownership trust) trustee, plan administrator, valuation firm and other professionals critical to a successful conclusion to the transaction and ongoing compliance;

(b) populate a data room, as requested, with necessary documents for pre-closing due diligence;

(c) coordinate with the valuation firm to establish all financial terms of the transaction, including without limitation, the purchase price for the shares to be sold to the ESOT; and

(d) assist the Company, its legal professionals and other business professionals to bring the Transaction to a successful conclusion.

2. The Company shall:

(a) make available to Tenor all information concerning the business, assets, operations, financial condition and prospects of the Company that Tenor reasonably requests in connection with the performance of its obligations hereunder. The Company shall continue to advise Tenor regarding any material developments or matters relating to the Company that occur during the term of Tenor's engagement hereunder; and

(b) furnish to Tenor the names of all financing sources and/or potential lenders with which the Company has been doing business or has had discussions regarding financing the currently contemplated transaction prior to or during the term of Tenor's engagement hereunder.

3. The Company will compensate Tenor for its services to be provided hereunder as follows:

(a) *Analysis and Structuring Stage.* For the period from the date of this letter until all of the Analysis and Structuring Stage services as described above in Section 1(1) have been completed and you instruct Tenor to proceed with a subsequent stage hereunder, the fee for Tenor's services hereunder will be paid from the retainer required in Section 16 below (the "Structuring Stage Fee"). Subject to section 15 of this Agreement, if the Company does not instruct Tenor to proceed beyond the Structuring Stage, the maximum fee due to Tenor under this engagement will not exceed the Structuring Stage Fee.

(b) *Financing Raise and Closing Stage.* If after the conclusion of the Analysis and Structuring Stage the Company wishes to proceed with the process, Tenor will conduct a financing raise. Upon the closing of an ESOP transaction, the Company shall pay to Tenor a fee (herein referred to as the "TCP Success Fee") which shall be equal to the greater of (i) 1.50% of the total of third party lender debt and/or equity financing funded (collectively, the "Total Facility"), (ii) 75 basis points (.75%) of the enterprise value of the Company as determined by the ESOT, or (iii) a minimum fee of $250,000; provided, however that (1) if the lender providing the financing for the transaction is a prior relationship of the Company and not introduced by Tenor then the percentage contained in subsection (i) of this paragraph shall be reduced from 1.5% to 1%; and (2) the fee payable under this Section 3(b) shall not exceed $1 million if the Total Facility is under $70,000,000 or $1,100,000 if the Total Facility exceeds $70 million and enterprise value of the Company as determined by the ESOT exceeds $180 million. For the avoidance of doubt, if any Transaction occurs in stages the maximum fee provided in this Section 3(b) shall apply to all stages and no duplication of fees shall occur hereunder. For example, if Tenor receives a fee for a closed Transaction involving the Company's incumbent lender and subsequently the incumbent lender's financing is replaced with financing obtained from a new lender, the fee previously paid to Tenor shall be credited against and shall reduce any subsequent fee payable to Tenor and all fees payable shall not exceed the applicable maximum fee provided in this Section 3(b).

(c) *Closing Stage, No Financing Raise.* If after the conclusion of the Analysis and Structuring Stage, the selling shareholders and Company indicate to Tenor that they wish to proceed with closing an ESOP transaction but they do not require Tenor to conduct a financing raise (e.g., selling shareholders will finance the entire transaction themselves or the Company will conduct the financing raise itself thru its own financing sources), the TCP Success Fee shall be reduced to the greater of (i) 50 basis points (.50%) of the enterprise value of the Company as determined by the ESOT, or (ii) a minimum fee of $150,000. Notwithstanding anything in this Agreement, the TCP Success Fee will be capped at a maximum of six hundred fifty thousand dollars ($650,000) if Company does not engage Tenor to conduct a financing raise. For clarity, the TCP Success Fee will only be earned under this paragraph if the ESOP transaction closes.

4. If the Company proceeds beyond the initial stage described in Section 3(a) above, the Company shall reimburse Tenor, upon request, for any reasonable out-of-pocket expenses Tenor incurs during the period of its engagement for such subsequent stages with respect to the services to be rendered by it. The Company will reimburse Tenor for these expenses within two weeks of submission. Total Tenor expenses are estimated to be less than $2,500, and Tenor will not exceed that amount without prior written consent of the Company.

5. After closing of the Transaction, if the Company requires Tenor to perform any additional financial advisory related services and Tenor agrees to perform such services, such services will be performed by Tenor at an hourly rate of $400.00 or on such other terms agreed to in writing at such time by the Company and Tenor. Tenor may also require a retainer for any such additional services which amount shall be mutually agreed upon at such time by Tenor and the Company.

6. Except as required by applicable law, any advice to be provided by Tenor under this Agreement shall not be disclosed publicly or made available to third parties, other than Company's advisors for this transaction, without the prior written approval of Tenor, and accordingly such advice shall not be relied upon by any person or entity other than the Company. All financial models produced by Tenor and the strategies devised therein and all works derivative thereof, shall remain the sole and exclusive property of Tenor.

7. The invalidity or enforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect.

8. The Company shall make available to Tenor all information concerning its business, assets, operations, financial condition and prospects which Tenor reasonably requests in connection with the performance of its obligations hereunder.   By providing such information to Tenor the Company represents to Tenor that all such information is accurate in all material respects, reasonable and was prepared in good faith. Tenor will hold such information in the strictest confidence and will not provide any of such information to any party without the prior consent of the Company. This information shall only be used by Tenor for the provision of its services hereunder and shall not be used for any other purpose or in any way adverse to the Company. Company shall be entitled to obtain any and all injunctive relief for any breach or threatened breach of this Agreement by Tenor provided under applicable law without posting a bond as a condition of such relief. Nothing contained herein shall be construed as limiting Company's right to any other remedies at law, including the recovery of damages for breach of this Agreement. If any Company information is required to be disclosed by Tenor pursuant to a requirement of a governmental agency, subpoena or other mandatory process, Tenor shall first notify Company prior to disclosure in order to give Company a reasonable opportunity to seek an appropriate protective order and/or waive compliance with the terms of this Agreement and shall disclose only that part of the information which Tenor is required to disclose. This paragraph shall survive the termination or expiration of this Agreement.

9. It is understood and agreed that Tenor will act under this Agreement as an independent contractor with duties solely to the Company. Nothing in this Agreement, express or implied, shall be deemed to create a fiduciary or agency relationship between Tenor and the Company or its stockholders or is intended to confer any relationship between any person or entity other than the parties hereto or their respective successors and assigns.

10.

    10.1    Subject to and as limited by paragraph 10.2, Tenor and Company (each an "Indemnifying Party" and collectively the "Indemnifying Parties") shall indemnify the other and its applicable affiliated companies, officers, directors, agents and employees (each an "Indemnified Party" and collectively the "Indemnified Parties") in respect of any claim,

demand, or cause of action brought by a third party (each, a "Third Party Claim") against an Indemnified Party that results in a final, non-appealable judgment requiring the payment by an Indemnified Party, in respect of such Third Party Claim, of damages, settlements, awards, penalties, fines, costs, or expenses actually incurred (collectively, "Losses"), which Losses are incurred by reason of, or to the extent in connection with: (a) a breach of this Agreement by the Indemnifying Party; (b) a breach by the Indemnifying Party of applicable law; and/or (c) any unlawful or negligent or more culpable act or omission of the Indemnifying Party giving rise to the Third Party Claim. In any such claim for indemnification under this paragraph 10 where the acts or omissions of both parties have contributed to the Losses, liability will be apportioned in accordance with the relative fault of the parties.

10.2     The Indemnifying Parties shall not be obligated to pay for any Losses under clause 10.1 until the amount in relation to one claim does not exceed $5,000 per claim and of all such Losses exceeds, in the aggregate, $50,000 USD, in which event the Indemnifying Parties shall pay or be liable for all such Losses from the first dollar. Notwithstanding anything else in this Agreement, neither party shall be liable for any Losses that exceed $1,000,000 per claim. REMEDIES EXCLUSIVE. THIS PARAGRAPH 10 SETS FORTH THE ENTIRE LIABILITY AND OBLIGATION OF THE INDEMNIFYING PARTIES AND THE SOLE AND EXCLUSIVE REMEDY FOR THE INDEMNIFIED PARTIES FOR ANY DAMAGES COVERED UNDER THIS PARAGRAPH 10.

11. NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY (INCLUDING UNDER PARAGRAPH 10) FOR ANY PUNITIVE, EXEMPLARY, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OR PENALTIES (INCLUDING LOST PROFITS, LOST SAVINGS AND THE INABILITY TO USE THE LICENSED PRODUCT(S)) ARISING OUT OF THIS AGREEMENT, DUE TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EVEN IF THE FIRST PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR PENALTIES. THIS LIMITATION OF LIABILITY SHALL BE APPLICABLE ONLY TO THE EXTENT PERMITTED BY LAW IN THE EVENT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OR IN THE EVENT OF PERSONAL INJURY OR DEATH. OTHER THAN CLAIMS UNDER PARAGRAPH 10 ABOVE, IN NO EVENT SHALL EITHER PARTY'S LIABILITY FOR ANY DAMAGES (DIRECT OR OTHERWISE) OR PENALTIES OR LOSS, REGARDLESS OF THE FORM OF ACTION OR CLAIM, EXCEED THE TOTAL AMOUNT OF ALL FEES ACTUALLY PAID BY COMPANY TO TENOR DURING THE TWELVE-MONTH PERIOD IMMEDIATELY PRECEDING THE EVENTS GIVING RISE TO THE CLAIM. CLAIMS NOT MADE WITHIN SIX (6) MONTHS AFTER THE FIRST EVENT GIVING RISE TO A CLAIM SHALL BE DEEMED WAIVED.

12. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to conflicts of law principles thereof. This Agreement constitutes the entire agreement between the parties, and supersede all prior agreements and understandings, whether oral or written, relating to the subject matter hereof. No other agreements shall be effective to change, modify, or terminate this Agreement in whole or in part unless in writing specifically referencing this Agreement and duly signed by authorized representatives of both parties. Only a written agreement signed by the parties by hand in ink on paper can modify this Agreement. Failure to enforce any provision of this Agreement shall not constitute a waiver of any term hereof. This Agreement may be executed in counterparts, each of which shall be deemed an original and each of which together shall

constitute one and the same instrument. Signatures transmitted by facsimile, pdf or other electronic means shall have the same effect as an original signature.

13. The benefits of and liabilities and obligations under this Agreement shall inure to and be binding upon the respective successors and assigns (whether by merger or otherwise) of the parties hereto and of the Indemnified Persons hereunder and their successors, assigns and representatives.

14. The Company hereby authorizes Tenor to discuss the Transaction and Company in standard investment banking marketing materials after the Transaction closes, but Tenor will not disclose any specific financial details of the Transaction.

15. The term of this engagement shall extend from the date hereof through the earlier of (i) twelve months from the date hereof or (ii) as such time either party terminates this Agreement by giving the other party at least 10 business days' prior written notice. To protect Tenor's intellectual property and to provide adequate consideration for the performance of its services hereunder, if the Company, or any subsidiary or affiliate thereof, within twelve (12) months of the termination of this engagement, closes any transaction involving the sale of shares to an ESOP or a financing transaction with any lender introduced to the Company or its shareholders by Tenor, the Company will be obligated to pay the TCP Success Fee calculated under Section 3(b) or, if TCP is not required by the Company to perform a financing raise, 3(c) of this Agreement. If for any reason the enterprise valuation of the Company as determined by the ESOP trustee is less than $165 million dollars and the Company determines not to close an ESOP transaction at such lower valuation, TCP shall have no right to payment under this paragraph. If TCP is required by the Company to perform a financing raise and the most favorable terms obtained provide maximum available financing of less than $70 million dollars or if the annual interest expense exceeds 9.03% (i.e., current 1-year LIBOR plus 600 basis points), and the Company determines not to proceed with a closing of such financing, Tenor's maximum fee payable under this paragraph shall be $650,000 (i.e., the maximum payment payable to Tenor as if it did not conduct a debt raise).

16. To initiate the engagement described in this letter, we require payment in advance of the Structuring Stage Fee which shall be **$12,500**. As previously discussed, the Structuring Stage Fee is the entire fee for the Structuring Stage and no other fee shall be due under this Letter unless the company closes a transaction as described in Section 14 hereinabove. Upon your execution of this agreement please remit the Structuring State Fee to the following address:

**Tenor Capital Partners, LLC**
**1266 W Paces Ferry Rd, Ste 419**
**Atlanta, GA 30327-2306**

Please ensure that you use the complete ZIP+4 code on your envelope to ensure prompt and accurate receipt and application of your funds. It is also important to include only your check in any mailing to the above address, as it is set up for receipt-of-funds only and any other items will not be reviewed.

We look forward to being of service to you and are confident you will find the results compelling.

TENOR CAPITAL PARTNERS LLC

Todd Butler, Managing Partner

*Acknowledged and agreed:*

GunBroker.com, LLC

By:

Steve Urvan, Chief Executive Officer

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| GunBroker.com, LLC | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | )   Case No.  1:20-cv-00613-TWT |
| | ) |
| Tenor Capital Partners, LLC, | ) |
| | ) |
|    Defendant | ) |
| | ) |
| | ) |

## LR 7.1(D) CERTIFICATE OF FONT COMPLIANCE

I hereby certify that the foregoing has been prepared with one of the font and

point selections approved by the Court in Local Rule 5.1(C), Northern District of

Georgia, specifically Times New Roman 14 point.

*/s/ John H. Goselin II*
JOHN H. GOSELIN II
Georgia Bar No. 302917


**LITCHFIELD CAVO LLP**
1300 Parkwood Circle SE, Suite 170
Atlanta, GA 30339-2143
Phone: (770) 628-7111
goselin@litchfieldcavo.com

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| GunBroker.com, LLC )<br><br>Plaintiff, )<br><br>v. )<br><br>Tenor Capital Partners, LLC, )<br><br>Defendant )<br> | Case No. 1:20-cv-00613-TWT |

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing AMENDED

COMPLAINT FOR RESCISSION AND DAMAGES using the Cm/ECF system,

which will send e-mail notification of such filing to all counsel of record:

> Richard L. Robbins
> Jeremy U. Littlefield
> Koty Newman
> **ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD LLC**
> 500 14th Street, N.W.
> Atlanta, Georgia 30318

This 16th day of March, 2020.

/s/ John H. Goselin II
JOHN H. GOSELIN II

- 44 -

Georgia Bar No. 302917

**LITCHFIELD CAVO LLP**
1300 Parkwood Circle SE, Suite 170
Atlanta, GA 30339-2143
Phone: (770) 628-7111
goselin@litchfieldcavo.com