IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GUNBROKER.COM, LLC,

    Plaintiff,

       v.

TENOR CAPITAL PARTNERS, LLC,

    Defendant.

CIVIL ACTION FILE
NO. 1:20-CV-613-TWT

## OPINION AND ORDER

This is a financing deal gone bad. It is before the Court on the
Defendant's Motion for Partial Summary Judgment [Doc. 75] and the
Plaintiff's Motion for Partial Summary Judgment [Doc. 87]. For the reasons
set forth below, the Defendant's Motion for Partial Summary Judgment [Doc.
75] is GRANTED in part and DENIED in part, and the Plaintiff's Motion for
Partial Summary Judgment [Doc. 87] is GRANTED in part and DENIED in
part.

## I.   Background

This action arises from the Plaintiff GunBroker.com, LLC's
("GunBroker" or "Company") efforts to create an employee stock ownership
plan ("ESOP"), a transaction in which Steve Urvan ("Urvan"), the founder,
chief executive officer, and sole shareholder of GunBroker, would sell his

Company stock to the ESOP trust at a negotiated price. GunBroker runs an online marketplace called GunBroker.com, where people can purchase and sell firearms and firearm accessories. (Def.'s SUMF ¶ 3.) In 2018, GunBroker engaged the Defendant Tenor Capital Partners, LLC ("Tenor") to provide financial advisory services in connection with GunBroker's potential installation of an ESOP and the financing thereof. (*Id.* ¶ 12.) Tenor describes itself as a boutique investment bank that specializes in advising corporations, shareholders, and lenders regarding ESOP transactions. Its principals are Todd Butler ("Butler"), an attorney and active member in good standing of the Georgia Bar, and Andre Schnabl ("Schnabl"), an accountant. (*Id.* ¶¶ 1–2; Def.'s Resp. to Pl.'s SUMF ¶ 15; Pl.'s SUMF ¶¶ 17, 21.)

On October 15, 2018, Urvan, Butler, and Schnabl met to discuss the proposed GunBroker ESOP. (Pl.'s SUMF ¶ 36.) Following the meeting, on October 16, 2018, Butler forwarded Urvan an engagement agreement ("Letter Agreement" or "Agreement") detailing the ESOP advisory services that Tenor would provide to GunBroker and Urvan. (*Id.* ¶ 38.) The draft Agreement contained the following fee arrangement, known as a tail provision:

> The term of this engagement shall extend from the date hereof through the earlier of (i) twelve months from the date hereof or (ii) as such time either party terminates this Agreement by giving the other party at least 10 business days' prior written notice. To protect Tenor's intellectual property and to provide adequate considering [sic] for the performance of its services hereunder, if the Company, or any subsidiary or affiliate thereof, within twelve (12) months of the termination of this engagement, closes any transaction involving the sale of shares to an ESOP or a financing

2

transaction with any lender introduced to the Company or its shareholders by Tenor, the Company will be obligated to pay the TCP Success Fee calculated under Section 3(b) of the Agreement.

(*Id.* ¶ 46.) On October 22, 2018, Urvan expressed concern with the tail provision, writing to Butler in an email, "We need to talk about this because I do not like a tail." (*Id.* ¶ 48.) Thereafter, the Letter Agreement, including the tail provision, underwent a series of revisions until the Parties agreed on final terms. (Butler Dep., Exs. 95, 96.)[1]

On November 11, 2018, Urvan forwarded Butler the final, executed version of the Letter Agreement. (Pl.'s SUMF ¶ 53.) Pursuant to the Agreement, Tenor would provide "limited financial advisory services . . . to the Company and its shareholders in connection with the Company's . . . potential

---

[1] Tenor argues that prior, non-final versions of the Letter Agreement and details of negotiations between the Parties are inadmissible parol evidence because the final Agreement contains the following merger clause:

> This Agreement constitutes the entire agreement between the parties, and supersede [sic] all prior agreements and understandings, whether oral or written, relating to the subject matter hereof.

(Def.'s Resp. to Pl.'s SUMF ¶¶ 46–52.) In general, Tenor is correct that "parol evidence of prior or contemporaneous representations or statements is inadmissible to add to, take from, or vary the written instrument." *Watson v. Zurich-American Ins. Co.*, 221 Ga. App. 4, 5–6 (1996) (citation omitted). However, where a "party elects to rescind the contract as voidable, he is not bound by the provisions of the rescinded contract," including the merger clause. *Del Mazo v. Sanchez*, 186 Ga. App. 120, 125 (1988) (emphasis omitted). Because GunBroker seeks to rescind the Letter Agreement through this action, the Court finds that the merger clause does not bar introduction of parol evidence.

installation of an [ESOP] and the financing thereof[.]" (Butler Dep., Ex. 22 at GB_000004.) Tenor's services were to be performed in three sequential stages, as authorized and instructed by GunBroker: (1) Analysis and Structuring Stage; (2) Financing Raise Stage; and (3) Closing Stage. (*Id.* at GB_000004–05.) At Stage 1, Tenor agreed to perform the following services:

> (a) assist the Company and shareholders to identify strategic objectives;
> (b) collect data, financial and otherwise from the Company;
> (c) conduct a high-level assessment of the tax issues relevant to the Transaction;
> (d) perform a preliminary, oral valuation of the Company;
> (e) design transaction alternatives to address strategic objectives;
> (f) consider the financial and tax implications of alternative transaction structures to the Company and the selling shareholders; and
> (g) develop an explanatory analysis of the Transaction which will include a ten-year transaction financial model providing the cash flows resulting from the Transaction and comparison(s) of alternative transactions.

(*Id.*) The Agreement calls for advance payment of a $12,500 "Structuring Stage Fee" to compensate Tenor for its Stage 1 analysis. (*Id.* at GB_000009.)

If GunBroker elected to proceed to Stages 2 and 3 of the Letter Agreement, Tenor would perform the following additional services:

> (a) review the Company's financial statements in order to evaluate financing options for the Transaction;
> (b) prepare a descriptive financing memorandum, to be used in discussions with lenders (including institutions with whom the Company currently has relationships);
> (c) contact banks and financial institutions regarding financing the transaction, arrange lender meetings, solicit proposals, assist in negotiating the final terms of the lending agreements and Transaction, and assist in closing the Transaction;
> (d) provide other financial advisory services as needed and

4

requested as necessary to assist the Company in obtaining financing for the Transaction;

(e) assemble the team responsible to execute the Transaction and administer the ESOP after closing, including, ESOT (employee stock ownership trust) trustee, plan administrator, valuation firm and other professionals critical to a successful conclusion to the transaction and ongoing compliance;

(f) populate a data room, as requested, with necessary documents for pre-closing due diligence;

(g) coordinate with the valuation firm to establish all financial terms of the transaction, including without limitation, the purchase price for the shares to be sold to the ESOT; and

(h) assist the Company, its legal professionals and other business professionals to bring the Transaction to a successful conclusion.

(*Id.* at GB_000005.) Upon the closing of an ESOP transaction, Paragraphs 3(b) and 3(c) set forth various formulas pursuant to which Tenor could earn a "TCP Success Fee" ("success fee") for its work at Stages 2 and 3. (*Id.* at GB_000006.) The applicable formula depends on whether the ESOP transaction requires a financing raise, and whether in the event of a financing raise, the lender is a prior relationship of GunBroker rather than Tenor. (*Id.*)

Paragraph 15 of the Letter Agreement contains the revised tail provision, which states:

The term of this engagement shall extend from the date hereof through the earlier of (i) twelve months from the date hereof or (ii) as such time either party terminates this Agreement by giving the other party at least 10 business days' prior written notice. To protect Tenor's intellectual property and to provide adequate consideration for the performance of its services hereunder, if the Company, or any subsidiary or affiliate thereof, within twelve (12) months of the termination of this engagement, closes any transaction involving the sale of shares to an ESOP or a financing transaction with any lender introduced to the Company or its shareholders by Tenor, the Company will be obligated to pay the

5

TCP Success Fee calculated under Section 3(b) or, if TCP is not required by the Company to perform a financing raise, 3(c) of this Agreement. If for any reason the enterprise valuation of the Company as determined by the ESOP trustee is less than $165 million dollars and the Company determines not to close an ESOP transaction at such lower valuation, TCP shall have no right to payment under this paragraph. If TCP is required by the Company to perform a financing raise and the most favorable terms obtained provide maximum available financing of less than $70 million dollars or if the annual interest expense exceeds 9.03% (i.e., current 1-year LIBOR plus 600 basis points), and the Company determines not to proceed with a closing of such financing, Tenor's maximum fee payable under this paragraph shall be $650,000 (i.e., the maximum payment payable to Tenor as if it did not conduct a debt raise).

(*Id.* at GB_000009.)

In December 2018, Urvan, on behalf of GB Investments, Inc. ("GB Investments"),[2] also signed an engagement letter with the law firm Smith Lynch, LLC ("Smith Lynch") to serve as special counsel to the Company "in connection with legal issues pertaining to the feasibility, analysis, structuring, installation and financing of an [ESOP] . . . and related matters[.]" (Def.'s SUMF ¶ 33.) Butler had organized Smith Lynch in 2016 and owned a 95-percent stake in the firm until December 31, 2018, after which he assigned all of his interest to Randolph Smith. (Pl.'s SUMF ¶ 24; Def.'s Resp. to Pl.'s SUMF ¶ 25.) According to Tenor, Butler informed Urvan that he had an individual interest in Smith Lynch before GB Investments engaged the firm. (Def.'s

---

[2] GunBroker states, without citation, that it is one of seven subsidiaries of IA Tech, Inc., which in turn is wholly owned by GB Investments, and that Urvan owns 100 percent of the stock of GB Investments. (Pl.'s SUMF ¶ 10.)

SUMF ¶ 34.) However, GunBroker disputes this assertion, emphasizing that the Smith Lynch engagement letter did not disclose the firm's affiliation with Tenor or Butler and did not seek a waiver of any associated conflicts of interest. (Pl.'s Resp. to Def.'s SUMF ¶ 34; Pl.'s SUMF ¶¶ 67–68.)

Following execution of the Letter Agreement, Tenor performed the financial and structuring analysis outlined in Stage 1 and presented its analysis to GunBroker, via email and orally, in a PowerPoint document dated November 19, 2018. (Def.'s SUMF ¶¶ 26–27; Pl.'s Resp. to Def.'s SUMF ¶ 28.) The presentation, which is labeled "Confidential Protected by Attorney-Client Privilege," details the potential benefits of an ESOP transaction to GunBroker and Urvan, the probable financial terms of such a transaction, and alternative transaction structures. (Def.'s SUMF ¶ 26; Def.'s App'x, Ex. 6 at GB_000111–43.) One section entitled "High Level Assumptions" states that "[p]reliminary valuation work indicates the Company has a current enterprise value of at least $180 million." (Def.'s App'x, Ex. 6 at GB_000119.) To calculate the enterprise value of GunBroker, Tenor "reviewed and analyzed GunBroker's financials and the enterprise valuations of comparable companies." (Def.'s SUMF ¶ 30.) Tenor also "vetted its enterprise valuation with a third[-]party valuation firm with no stake in the GunBroker deal." (*Id.* ¶ 31.) However, GunBroker claims, and Tenor does not dispute, that Tenor "never obtained a formal valuation opinion as part of [its] Stage 1 Structuring Work[,] nor did [it] perform a formal valuation of GunBroker [itself]." (Pl.'s SUMF ¶ 60.)

In relevant part, the presentation also states that Urvan's GunBroker stock would be worth $137.75 million in a sale to an ESOP (*i.e.*, the initial total equity value). (Def.'s App'x, Ex. 6 at GB_000120, GB_000141.) That compares to a value of $151.525 million if sold to a strategic buyer and $117.088 million if sold to a financial buyer. (*Id.* at GB_000131.) Factoring in the "net tax results" of these alternative transactions, the presentation concludes that "[w]hile sales to strategic and financial buyers often result in greater cash at closing to sellers, the LESOP transaction often provides the greatest financial results over the medium and long term." (*Id.*) The presentation then outlines a "long[-]term detailed cost/benefit analysis of a 1042 election for the shareholder(s)," which would allow Urvan to defer capital gains taxes incurred in the ESOP transaction. (*Id.*   at GB_000141.) Following this analysis, Tenor included a statement on the final slide that:

> [t]he actual outcome of any ESOP transaction is subject to negotiations with lenders and the ESOP trustee and advisors thereof, but the analysis presented in this presentation is reasonably indicative of probable terms based upon the information you have provided to us and the assumptions indicated herein.

(*Id.* at GB_000143.)

After completing Stage 1 of the Letter Agreement, GunBroker instructed Tenor to proceed to a financing raise at Stage 2. As part of this process, Tenor states that it prepared a financing memorandum in January 2019 for use in discussions with potential lenders. (Def.'s SUMF ¶ 37.)

GunBroker disputes this assertion, arguing that Tenor contracted with a third party named Carter Cheskey ("Cheskey") to perform most of the work on the financing memorandum. (Pl.'s SUMF ¶¶ 72–73; Pl.'s Resp. to Def.'s SUMF ¶ 37.) However, Tenor responds that Cheskey was a "director" at Tenor, and worked on behalf of Tenor, in connection with the GunBroker transaction. (Def.'s Resp. to Pl.'s SUMF ¶¶ 72–73.) On or about January 15, 2019, Tenor circulated the financing memorandum to at least 22 potential lenders and received one term sheet from MGG Investment Group, LP ("MGG"). (Pl.'s SUMF ¶¶ 74–75.) Tenor negotiated a term sheet with MGG for a loan of up to $70 million, which Urvan executed on behalf of GunBroker on February 15, 2019. (Def.'s SUMF ¶¶ 47–49; Pl.'s SUMF ¶¶ 79–81.) While GunBroker argues that Cheskey (not Tenor) took the lead in the MGG negotiations, Tenor again points out that Cheskey was its representative on the financing raise. (Pl.'s SUMF ¶ 79; Def.'s Resp. to Pl.'s SUMF ¶ 79.)

The Parties also dispute how MGG became involved in the proposed ESOP transaction and whether it was through Tenor's or GunBroker's network of contacts. According to Tenor, it reached out to a connection named Ty Dealy ("Dealy") about the GunBroker financing raise, who suggested MGG as a possible lender and personally reached out to MGG to gauge its interest. (Def.'s SUMF ¶¶ 39–41.) Tenor states that MGG sought an introduction to the transaction as a result of Dealy (and, by extension, Tenor), and that GunBroker had never had any direct contact with MGG relating to an ESOP prior to

Tenor's engagement. (*Id.* ¶¶ 43–44.) By contrast, GunBroker claims that it became acquainted with MGG in September 2018 through Goldman Sachs & Co., LLC and Founders Advisors, LLC, and that it shared MGG's contact with Tenor as a possible lender during the financing raise. (Pl.'s SUMF ¶ 35; Pl.'s Resp. to Def.'s SUMF ¶ 38.) GunBroker also cites an email from Kevin Griffin of MGG stating that Dealy's request for "a fee wouldn't be appropriate on this one" because "we have been seeing [the GunBroker deal] from a number of places[.]" (Pl.'s Resp. to Def.'s SUMF ¶ 42; Dealy Dep., Ex. 8 at DLY 00014.)

Following the execution of the MGG term sheet, either Tenor or Smith Lynch identified Robert Lesser of Aegis Fiduciary Services, LLC ("ESOP Trustee") to serve as the trustee for the GunBroker ESOP. (Pl.'s SUMF ¶ 83.) Smith Lynch forwarded the engagement letter for the ESOP Trustee, which included a $200,000 fee, to GunBroker on or about February 22, 2019. (Butler Dep., Ex. 43 at GB_001913.) In an email to Butler, Urvan questioned why Smith Lynch had asked GB Investments for $200,000, and whether it was Tenor's responsibility to pay the fee instead. (Urvan Dep., Ex. 44 at GB_001923.) Butler clarified that "Tenor doesn't pay anyone," which prompted the following response from Urvan:

> You and I need to discuss this because that is not at all my understanding from our conversations or the engagement letter. I agreed to pay Tenor up to $1M to close an ESOP transaction. If I have to pay $1M to Tenor plus $650 to lawyers, trustees, etc, plus $1.75M for financing then the deal is far too expensive.

(*Id.*) When the two spoke by phone about the matter, Butler apparently stated

10

that Tenor was acting only as an investment bank in the proposed ESOP transaction. (Pl.'s SUMF ¶ 87.) Urvan then disinvited Tenor from both a dinner and a diligence meeting scheduled with MGG. (Def.'s SUMF ¶ 53.

On February 26, 2019, Urvan contacted Cory Manning, an attorney with Nelson Mullins Riley & Scarborough, requesting "advice on a [Georgia] security law matter." (Urvan Dep., Ex. 48 at GB_000003.) Later that day, Urvan sent an email to Butler asking the following question:

> My attorneys asked me to ask you about your broker dealer license, or more specifically apparent lack thereof. They have been unable to verify that Tenor Capital Partners, LLC or its principals has the proper licenses. They asked me to ask you if Tenor is licensed, or if there is an exception from registration applicable to your business. If operating on an exception, they will need info to verify the validity of the exception.

(Pl.'s SUMF ¶ 91.) Butler interpreted this email and the substantive question as a ploy to renegotiate Tenor's success fee and decided not to "dignify it with a response." (*Id.* ¶¶ 92–93.) Tenor admits that it has never been registered with the United States Securities and Exchange Commission ("SEC") as either an investment adviser pursuant to the Investment Advisers Act of 1940 or as a broker-dealer pursuant to the Securities Exchange Act of 1934. (Def.'s Resp. to Pl.'s SUMF ¶ 22.)

On February 27, 2019, GunBroker returned an executed copy of the ESOP Trustee engagement letter to Smith Lynch and informed the firm that "Tenor Capital is no longer involved in this transaction. They are not to be copied on any correspondence and the transaction should not be discussed

11

with them." (Def.'s SUMF ¶ 57.) When Butler called Smith Lynch to check on the status of the transaction, an attorney there informed him that GunBroker had terminated Tenor. (*Id.* ¶ 58.) Butler then emailed Urvan on February 28, 2019, to "confirm that we have received notice of your termination of our engagement, effective yesterday"—a reference to Urvan's earlier email to Smith Lynch. (*Id.* ¶ 59; Pl.'s SUMF ¶ 101.) The next day, Urvan provided the following response to Butler:

> We have not provided notice of termination. Andre called one of our board members and repeatedly asked to be released from the engagement. We are inclined to honor that request provided that the attached document is signed. The attached document releases both sides from the engagement without assigning fault or blame.
>
> Without registration and licensing, it is illegal (including both civil and criminal penalties) to effect securities transactions on a contingency fee basis. The sale of shares to an ESOP is a securities transaction. Neither side can proceed with an engagement that cannot be executed legally.
>
> I have no interest in fighting over this engagement. Andre expressed the same sentiment. Let's execute this termination doc and get on with our respective business.

(Def.'s Resp. to Pl.'s SUMF ¶ 103.) The referenced Termination and Release was never executed by the Parties. (Pl.'s SUMF ¶ 105.)

Following this exchange, GunBroker continued to pursue an ESOP without the assistance of Tenor. It engaged a number of firms to provide financial, legal, and other professional services in connection the transaction, including Comstock Valuation Advisors, Inc. ("Comstock"). (Pl.'s SUMF ¶¶ 107–11.) The purpose of Comstock's engagement was "to render a written

opinion . . . to the [ESOP] Trustee . . . as to whether . . . [t]he consideration to be paid by the ESOP for the Company's common stock is not more than fair market value[.]" [3] (Urvan Dep., Ex. 64 at GB_000494.) According to GunBroker, Comstock created two documents entitled "Enterprise Value Summary" and "Equity Value Summary." (Pl.'s SUMF ¶¶ 116–17.) Both documents are dated April 25, 2019, and make no reference to either GunBroker or Comstock. The "Enterprise Value Summary" document contains a "Transaction Offer" of $239.27 million and a "Recommended Enterprise Value Range" with a low value of $124.2 million, a mid value of $136.475 million, and a high value of $150 million. (Goselin Decl., Ex. B [Doc. 86-1] at CA-GB000137.) These values were calculated as the averages of two valuation methods: the "Discounted Cash Flow Method" and the "Capitalized Cash Flow Method." (*Id.*) Meanwhile, the "Equity Value Summary" document contains a "Transaction Offer" of $215 million and a "Total ESOP Purchase Price" with a low value of $105.694 million, a mid value of $117.340 million, and a high value of $130.171 million. (Goselin Decl., Ex. C [Doc. 86-1], at CA-GB000138.)

Tenor objects to the "Enterprise Value Summary" and "Equity Value Summary" documents as inadmissible hearsay because:

> [t]here is no other evidence in the record from any witness with actual knowledge of how this document was 'created and maintained' by Comstock, when this document was created, who created it, how it was created, what information was used,

---

[3] In this context, the term "Company" refers to GB Investments and not GunBroker.

> whether it was a final version, whether it was a draft, and
> whether it was actually considered and relied upon by Comstock.

(Def.'s Resp. to Pl.' SUMF ¶ 117.) The Court agrees with Tenor. "Generally, documents must be properly authenticated in order for them to be considered on summary judgment." *APA Excelsior III, L.P. v. Windley*, 329 F. Supp. 2d 1328, 1335 (N.D. Ga. 2004). Authentication "may be accomplished through the testimony of a witness with knowledge." *United States v. Kandhai*, 629 F. App'x 850, 853 (11th Cir. 2015). GunBroker submits only a declaration from its attorney, John H. Goselin II ("Goselin"), in an effort to authenticate the "Enterprise Value Summary" and "Equity Value Summary" documents. (Goselin Decl. [Doc. 86].) However, Goselin does not have the requisite personal knowledge to authenticate Comstock business records or speak to the ambiguous, technical contents of these particular documents.[4] *Cf. Elwakin v. Target Media Partners Operating Co. LLC*, 901 F. Supp. 2d 730, 742 (E.D. La. 2012) ("The fact that the document was produced by the opposing party in discovery is not conclusive as to its authenticity."). The Court will not now guess or make assumptions as to their origin or contents.

---

[4] Indeed, Goselin, on behalf of GunBroker, tried and failed to obtain a declaration from the managing director of Comstock regarding these documents and then unsuccessfully petitioned this Court to allow the Parties to depose Comstock, after the discovery period had expired and summary judgment had been fully brief. (Pl.'s Mot. for Leave to Take the Dep. of Comstock [Doc. 102], at 5.)

Ultimately, GunBroker stopped pursuing the proposed ESOP transaction in May 2019, alleging that the ESOP Trustee never offered more than $120 million to purchase Urvan's stock. (*Id.* ¶¶ 118–22.) Tenor objects to this statement because GunBroker's cited exhibits refer to a proposed sale of equity in GB Investments, not GunBroker, to the ESOP. (Def.'s Resp. to Pl.'s SUMF ¶¶118–21.) In any event, shortly after abandoning an ESOP, GunBroker closed a $65 million credit facility with MGG. (Pl.'s SUMF ¶ 123.) When Tenor learned about the facility agreement, it sent GunBroker an invoice dated October 10, 2019, for $1.05 million; GunBroker has never paid the invoice. (Pl.'s SUMF ¶ 129; Def.'s SUMF ¶¶ 72–73.) Further, Tenor engaged the law firm Eversheds Sutherland LLP ("Eversheds") to send a "Request for a No Action Letter—ESOP Advisor Activities" to the SEC in August 2019. (Pl.'s SUMF ¶ 127.) The letter requests assurance that SEC staff would not recommend enforcement action against a person who is engaged in certain ESOP advisory services without registering as a broker or a dealer pursuant to the Securities Exchange Act. (Butler Dep., Ex. 90 at TCP 001168.) Neither Tenor nor Eversheds has received a written response to the letter. (Pl.'s SUMF ¶ 128.)

On February 10, 2020, GunBroker filed this action against Tenor for rescission of the Letter Agreement and monetary damages. The Amended Complaint alleges that the Letter Agreement is void *ab initio* due to Tenor's failure to register as an investment adviser and a broker-dealer pursuant to

the Investment Advisers Act, the Securities Exchange Act, and the Georgia Uniform Securities Act ("Georgia Securities Act"). (Am. Compl. ¶¶ 32–60.) In the alternative, to the extent that the Letter Agreement is a valid and enforceable contract, GunBroker alleges that Tenor breached the contract by abandoning the engagement in February 2019. (*Id.* ¶ 62.) GunBroker also brings claims for fraud in the inducement, breach of fiduciary duty, negligent misrepresentation, and recoupment. (*Id.* ¶¶ 69–103.) In its Answer, Tenor asserts counterclaims against GunBroker for breach of contract, fraud, unjust enrichment, attorneys' fees, and punitive damages. (Answer ¶¶ 64–119.) The Parties have filed cross-motions for summary judgment in connection with all of these claims and counterclaims, as described in detail below.

## II.    Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). On summary judgment, a court may not weigh conflicting evidence or make credibility determinations of its own. *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999). If the record presents disputed issues of fact, the court may not decide them; rather, it must deny the motion and proceed to trial. *Tullius v. Albright*, 240 F.3d 1317, 1320 (11th Cir. 2001).

## III.   Discussion

### A. GunBroker's Counts I and III: Rescission of Letter Agreement for Failure to Register as Investment Adviser

GunBroker moves for summary judgment on its Counts I and III to rescind the Letter Agreement based on Tenor's failure to register as an investment adviser, in violation of the Investment Advisers Act and the Georgia Securities Act. (Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 29–31.) Tenor also moves for summary judgment on these claims, arguing that (1) neither statute provides a private cause of action for damages; (2) GunBroker failed to provide notice of rescission and tender back the benefits of the Letter Agreement before filing this action, as required by Georgia law; and (3) Tenor does not meet the definition of an "investment adviser" under either the Investment Advisers Act or the Georgia Securities Act. (Def.'s Br. in Supp. of Def.'s Mot. for Partial Summ. J., at 9–11.) The Court addresses these arguments in turn, starting with GunBroker's federal law claim and then considering whether its closely related state law claim merits a different

outcome.

### 1. Applicability of the Investment Advisers Act

The Investment Advisers Act provides a private cause of action to rescind a contract with an unregistered investment adviser. Under Section 215, any contract whose formation or performance would violate the statute "shall be void . . . as regards the rights of" the wrongdoer. 15 U.S.C. § 80b-15(b). The Supreme Court has interpreted this provision to confer a limited right to sue "for recission or for an injunction against continued operation of the contract, and for restitution." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979). One available basis for such a suit is Section 203, which bars an investment adviser from "mak[ing] use of the mails or any means or instrumentality of interstate commerce in connection with his or its business as an investment adviser" unless registered with the SEC. 15 U.S.C. § 80b-3(a); *see In re Living Benefits Asset Mgmt., LLC*, 916 F.3d 528, 543 (5th Cir. 2019). However, no provision of the Investment Advisers Act creates a private cause of action for damages or other monetary relief. *Transamerica*, 444 U.S. at 19–20. Tenor is thus entitled to summary judgment insofar as GunBroker seeks monetary damages in Count I. (Am. Compl. ¶ 39.)

Before moving to the merits of GunBroker's claim, the Court must address one more threshold question disputed by the parties: whether GunBroker was required to attempt rescission by tendering back the benefits of the Letter Agreement prior to filing suit. In Tenor's view, GunBroker has

18

ratified the Letter Agreement and waived its Investment Advisers Act claim because, under Georgia law, "rescission or attempted rescission is a condition precedent even to bringing an action seeking rescission." (Def.'s Br. in Opp'n to Pl.'s Mot. for Partial Summ. J., at 14 (quoting *Dodds v. Dabbs, Hickman, Hill & Cannon, LLP*, 324 Ga. App. 337, 341 (2013)).) In response, GunBroker accuses Tenor of "improperly attempt[ing] to graft a Georgia common law requirement regarding the timing of rescinding a contract into a federal cause of action and a federal affirmative defense." (Pl.'s Br. in Opp'n to Def.'s Mot. for Partial Summ. J., at 30.) While GunBroker cites no support for this argument, the Court's own research concurs that the common law rules of tender-back and ratification do not apply to suits under the Investment Advisers Act.

"[T]he question whether a tender back of the consideration was a prerequisite to the bringing of the suit is to be determined by federal rather than state law." *Hogue v. Southern Ry. Co.*, 390 U.S. 516, 517 (1968). The Supreme Court addressed this question in *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998), rejecting a tender-back rule under the Age Discrimination in Employment Act ("ADEA"), as amended by the Older Workers Benefit Protection Act. In *Oubre*, the plaintiff filed an age discrimination suit against her former employer, Entergy, after signing a release of all claims against it in a severance agreement. *Id.* at 424–25. Even though the release violated the Older Workers Act, Entergy argued that the plaintiff's failure to tender back

her severance pay ratified the release and barred her suit. *Id.* at 425. The Court disagreed, noting that "in equity, a person suing to rescind a contract, as a rule, is not required to restore the consideration at the very outset of the litigation." *Id.* at 426. The Court also held that the Older Workers Act "sets up its own regime for assessing the effect of ADEA waivers, separate and apart from contract law," and thus "forecloses the employer's defense, notwithstanding how general contract principles would apply to non-ADEA claims." *Id.* at 427. Finally, the Court explained that a tender-back requirement "would frustrate the statute's practical operation" because "a discharged employee likely will have spent the moneys received and will lack the means to tender their return." *Id.* at 423.

Following *Oubre*, courts routinely reject tender-back and ratification rules under federal remedial statutes that evince an intent to move beyond common law principles. *See, e.g., McClellan v. Midwest Machining, Inc.*, 900 F.3d 297 (6th Cir. 2018) (collecting cases); *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770 (3d Cir. 2007); *see also Long v. Sears Roebuck & Co.*, 105 F.3d 1529 (3d Cir. 1997) (pre-*Oubre* decision). The Court finds that the Investment Advisers Act is such a statute. First, as the Supreme Court has recognized, the Investment Advisers Act is a "remedial" statute because it seeks "to prevent fraudulent practices by investment advisers" and protect investors. *SEC v. Capital Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 195 (1963). A tender-back requirement could undermine these goals by deterring plaintiffs

20

from bringing meritorious claims. *See Jakimas*, 485 F3d at 784. Second, Congress intended the Investment Advisers Act "to occupy the area of [investment advisory contracts] and, in doing so, to supplant the common law[.]" *Long*, 105 F.3d at 1539. By rendering a contract void if an investment adviser is not registered with the SEC, the Investment Advisers Act offers investors protection beyond "fraud, duress, or [any] other [contract] defect recognized at common law." *Id.* at 1542. The Court "cannot with ease presume ratification of that which Congress forbids." *Oubre*, 522 U.S. at 427. Therefore, GunBroker was not required to provide notice and tender back any benefits received under the Letter Agreement before bringing this claim for rescission and restitution.[5]

With those threshold questions answered, the Court turns finally to whether Tenor was required to register as an investment adviser pursuant to the Investment Advisers Act. An "investment adviser" is defined as:

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of

---

[5] As a practical matter, the Court also notes that it is unclear what, if anything, GunBroker would be required to tender back to Tenor in this case. Tenor argues only that GunBroker was required to return its "work product" before filing suit, but Tenor presumably already has possession of any work product provided to GunBroker. (Reply Br. in Supp. of Def.'s Mot. for Partial Summ. J, 11.) Therefore, it is unclear how a tender-back requirement would place Tenor in substantially its original position. *See, e.g.*, *Jakimas*, 485 F.3d 770, 784 ("[A] determination of exactly what Meechan would have been required to tender back is unclear and debatable."); *Long*, 105 F.3d 1529, 1543–44 (discussing "practicality" as a factor favoring rejection of a tender-back rule in the ADEA).

investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities[.]

15 U.S.C. § 80b-2(a)(11). In GunBroker's view, Tenor meets this definition because it "was advising GunBroker regarding the fair valuation of the Company's stock and advising the Company and/or its sole shareholder whether or not to sell the Company stock to an [ESOP] which Tenor . . . promised to help create." (Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 30.) Tenor disputes this characterization, claiming that it gave only a "preliminary, oral valuation of the Company, not of any securities," and never "advise[d] GunBroker regarding selling securities" since "[t]here was never to be a sale, or offer to sell, GunBroker securities into any market." (Def.'s Br. in Supp. of Def.'s Mot. for Partial Summ. J., at 10–11 (quotation marks, citation, and emphasis omitted).)

To the Court's knowledge, the SEC has never addressed whether an ESOP adviser like Tenor is an investment adviser for purposes of the Investment Advisers Act, nor do the Parties cite any regulations, agency guidance, or case law to aid our analysis of this novel issue. The Court turns then to *United States v. Elliott*, 62 F.3d 1304, 1309 (11th Cir. 1995), in which the Eleventh Circuit adopted an SEC "interpretive release" to determine who comes within the statutory definition of "investment adviser." Under *Elliott*, a person is an investment adviser if, taking into account "all the relevant facts and circumstances," he "(1) [p]rovides advice, or issues reports or analyses,

regarding securities; (2) is in the business of providing such services; *and* (3) provides such services for compensation." *Id.* at 1310 (emphasis in original) (quoting 52 Fed. Reg. 38,400, 38,401–02 (Oct. 16, 1987)). In this case, the Court finds no genuine issue of material fact that Tenor meets all three elements of the *Elliott* standard and is thus an investment adviser within the meaning of the Investment Advisers Act.

First, Tenor plainly provided advice regarding securities as part of the GunBroker engagement. The proposed ESOP transaction involved a sale of Urvan's GunBroker stock, which the Investment Advisers Act defines as a "security," to the ESOP trust, 15 U.S.C. § 80b-2(a)(18), and the Letter Agreement expressly contemplated that Tenor would counsel both GunBroker and Urvan, as shareholder, on this sale. (Butler Dep., Ex. 22 at GB_000004.) Moreover, Tenor's advice implicated "the value of securities" and "the advisability of . . . selling securities[.]" 15 U.S.C. § 80b-2(a)(11). At Stage 1 of the Letter Agreement, Tenor agreed to "perform a preliminary, oral valuation of the Company," "design transaction alternatives," and "consider the financial and tax implications of alternative transaction structures to the Company and the selling shareholders." (Butler Dep., Ex. 22 at GB_000004–05.) Later, Tenor was supposed to "coordinate with the valuation firm to establish all financial terms of the transaction, including . . . the purchase price for the shares to be sold to the ESOT[.]" (*Id.* at GB_000005.) These tasks fall squarely within the Investment Advisers Act's "broad definition" of investment adviser. *Financial*

*Planning Ass'n v. SEC*, 482 F.3d 481, 484 (D.C. Cir. 2007).

Tenor's actual performance under the Letter Agreement further confirms that it provided investment advice to GunBroker and Urvan. For example, in its Stage 1 presentation, Tenor stated that GunBroker has a current enterprise value of "at least $180 million" and an initial total equity value (*i.e.*, the value of Urvan's stock if sold to an ESOP) of $137.75 million. (Def.'s App'x, Ex. 6 at GB_000119.) Further, Tenor compared the proposed ESOP transaction to the financial returns that Urvan could expect in a sale to a strategic or financial buyer: the presentation provides a Company value of $151.525 million if sold to a strategic buyer and $117.088 million if sold to a financial buyer, compared to $137.75 million if sold to an ESOP. (*Id.* at GB_000131.) Based on these projections and the tax advantages of an ESOP transaction, Tenor concluded that "[w]hile sales to strategic and financial buyers often result in greater cash at closing to sellers, the LESOP transaction often provides the greatest financial results over the medium and long term." (*Id.*) Finally, Tenor conducted a "long[-]term detailed cost/benefit analysis" of a tax-advantaged ESOP transaction to Urvan and his heirs. (*Id.* at GB_000141.)

Faced with this evidence, Tenor makes a number of hair-splitting arguments in an attempt to distinguish an ESOP transaction from a security: namely, that (1) Tenor "provide[d] a preliminary, oral valuation of the Company, not of any securities"; (2) "[t]here was never to be a sale, or offer to

24

sell, GunBroker securities into any market"; and (3) the transfer of securities from a shareholder to an ESOP "is not subject to registration under the Securities Act of 1933" ("Securities Act"). (Def.'s Br. in Supp. of Def.'s Mot. for Partial Summ. J., at 10–11 (quotation marks, citation, and emphasis omitted); Reply Br. in Supp. of Def.'s Mot. for Partial Summ. J., at 13.) None of these arguments are persuasive. First, as described above, the record shows that Tenor did in fact perform a valuation of GunBroker securities. Second, it is irrelevant that no GunBroker stock was to be sold publicly in the proposed ESOP transaction because securities need not "be publicly held or traded in order for an adviser to come within" the Investment Advisers Act. Swithin J. E. McMillan, SEC No-Action Letter, 1975 WL 11482, at *1 (July 16, 1975). Lastly, it is unclear how security registration under the Securities Act may bear on the definition of "investment adviser" under the Investment Advisers Act, nor does Tenor cite any authority explaining the purported relationship between the two concepts.

Returning to the three-factor *Elliott* standard, the only remaining questions for the Court are whether Tenor was "in the business of advising others" and whether it did so "for compensation." 62 F.3d at 1310 (quoting 15 U.S.C. § 80b-2(a)(11)). The SEC considers a person to be "in the business" of providing investment advice if he:

> (i) [h]olds himself out as an investment adviser or as one who provides investment advice, (ii) receives any separate or additional compensation that represents a clearly definable

25

charge for providing advice about securities, regardless of whether the compensation is separate from or included within any overall compensation, or receives transaction-based compensation if the client implements . . . the investment advice, or (iii) on anything other than rare, isolated and non-periodic instances, provides specific investment advice.

52 Fed. Reg. at 38,402. The Court finds that Tenor satisfies all three of these disjunctive factors. First, Tenor holds itself out as a "boutique investment bank" focused on advising, and acting as advocate for, companies, shareholders, and management teams in "analyzing, structuring, financing and implementing [ESOPs]." (Def.'s App'x, Ex. 6 at GB_000111.) Second, under the Letter Agreement, Tenor received a flat fee for its structuring advice at Stage 1 and was entitled to transaction-based compensation (*i.e.*, the success fee) in the event of a successful ESOP or financing deal. Third, Tenor has apparently provided investment advice on more than rare, isolated occasions, including to dozens of companies in connection with their ESOP transactions. (*Id.*) Finally, Tenor has given advice "for compensation" under the SEC's broad definition of the term, which includes "the receipt of any economic benefit, whether in the form of an advisory fee or some other fee relating to the total services rendered, commissions, or some combination of the foregoing." 52 Fed. Reg. at 38,403.

The Investment Advisers Act excludes from the definition of "investment adviser" "any broker . . . whose performance of such services is solely incidental to the conduct of his business as a broker . . . and who receives

26

no special compensation therefor[.]" 15 U.S.C. § 80b-2(11). GunBroker alleges that Tenor also acted as a broker under the Securities Exchange Act. The Defendant denies that it is a "broker" under the Securities Exchange Act and does not rely upon 15 U.S.C. § 80b-2(11) in defense of the Plaintiff's claim under the Investment Advisers Act. Because the remedy sought in Count II of the Amended Complaint is the same as that sought in Count I, it is unnecessary to address the merits of Plaintiff's claim under Count II. The Plaintiff's Motion for Summary Judgment as to its claim for recission in Count I should be granted. Therefore, no cause of action based in contract can stand, including GunBroker's claims for breach of contract (Count V) and recoupment (Count IX) and Tenor's counterclaim for breach of contract (Count I).

### 2. Applicability of the Georgia Securities Act

The Georgia Securities Act defines "investment adviser" to include materially identical activities as the Investment Advisers Act, even down to the "broker-dealer" exception. *Compare* O.C.G.A. § 10-5-2(17), *with* 15 U.S.C. § 80b-2(a)(11). The statute requires "federal covered investment advisers" to "file a notice, a consent to service of process . . . and such records as have been filed with the [SEC] under the [Investment Advisers Act][.]" O.C.G.A. § 10-5-34(c). A client also has a private right to recover consideration paid for investment advice, including interest, costs, and reasonable attorney fees, if an investment adviser is not properly registered with the state. *Id.* § 10-5-58(e). However, this cause of action is not available against a federal covered

investment adviser. *See id.* § 10-5-58(e) (omitting a violation of O.C.G.A. § 10-5-34 as a basis for restitution); *id.* § 10-5-32 (exempting federal covered investment advisers from state registration requirements). Because Tenor is a federal covered investment adviser under the Investment Advisers Act, the Court grants Tenor's Motion for Summary Judgment on GunBroker's Count III for violation of the Georgia Securities Act.

The Georgia Securities Act, like the Securities Exchange Act, defines "broker-dealer" to mean "a person engaged in the business of effecting transactions in securities for the account of others[.]" O.C.G.A. § 10-5-2(3). The statute makes it "unlawful for a person to transact business in this state as a broker-dealer unless the person is registered" with the state. *Id.* § 10-5-30(a). If "[a] person acting as a broker-dealer or agent . . . sells or buys a security" in violation of the registration requirement, he "is liable to the customer." *Id.* § 10-5-58(d). GunBroker argues that this provision confers a right to rescind the Letter Agreement; however, any remedy thereunder is expressly conditioned on a sale or purchase of a security by the broker-dealer. (Pl.'s Br. in Opp'n to Def.'s Mot. for Partial Summ. J., at 33 n.10.) Because GunBroker has not alleged that Tenor ever sold or purchased a security in connection with the proposed ESOP transaction, the Court grants Tenor's Motion for Summary Judgment on GunBroker's Count IV as to the O.C.G.A § 10-5-58(d) claim.

## B. GunBroker's Count VI: Fraud in the Inducement

Tenor moves for summary judgment on GunBroker's Count VI for fraud

28

in the inducement, which alleges that Tenor induced GunBroker to enter into the Letter Agreement and continue past Stage 1 by falsely representing the Company's enterprise value. (Def.'s Br. in Supp. of Def.'s Mot. for Partial Summ. J., at 20.) Tenor argues that (1) the merger clause contained in the Letter Agreement precludes GunBroker from relying on any pre-Letter Agreement statements as a matter of law; (2) GunBroker has no evidence that Tenor's enterprise valuation of $180 million was false or fraudulent; (3) GunBroker has no evidence to prove Tenor's scienter or intention to induce GunBroker to act upon any false representations; and (4) GunBroker cannot show justifiable reliance on Tenor's valuation due to accompanying disclaimers. (*Id.* at 20–22.) GunBroker hardly mounts a defense of its fraudulent inducement claim, stating, without evidentiary citations, that Tenor promised to reach a $165 million enterprise valuation with the ESOP transaction but made no real, professional effort to determine the valuation once hired. (Pl.'s Br. in Opp'n to Def.'s Mot. for Partial Summ. J., at 38–39.)

To establish fraud under Georgia law, "a plaintiff must prove (1) false representation by a defendant; (2) scienter; (3) intention to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff." *Bithoney v. Fulton-Dekalb Hosp. Auth.*, 313 Ga. App. 335, 343 (2011) (quotation marks and citation omitted). On summary judgment, the plaintiff's claim will not survive unless there is "some evidence from which a jury could find each element of the tort." *Id.* (citation omitted).

"It is axiomatic that a false representation made by a defendant, to be actionable, must relate to an existing fact or a past event. Fraud cannot consist of mere broken promises, unfilled predictions or erroneous conjecture as to future events." *Infrasource, Inc. v. Hahn Yalena Corp.*, 272 Ga. App. 703, 707 (2005) (citation omitted). Further, to show "justifiable reliance," there must be "proof that due care was exercised to discover the fraud." *Id.* (citation omitted). In the case of a "sophisticated businessman," even "greater diligence is required before reliance upon representations may be considered justified." *William Goldberg & Co., Inc. v. Cohen*, 219 Ga. App. 628, 631 (1995).

As a threshold matter, the Court rejects Tenor's argument that GunBroker must limit its fraud allegations to statements made after execution of the Letter Agreement. In general, Tenor is correct that "a valid merger clause . . . precludes any subsequent claim of deceit based upon pre-contractual representations." *Legacy Acad., Inc. v. Mamilove, LLC*, 297 Ga. 15, 19–20 (2015). However, this rule does not apply in cases where a contract has been rescinded by one of the parties and thus "stands as if it had never been made[.]" *Del Mazo*, 186 Ga. App. at 125 (citation omitted).

> It is inconsistent to apply a disclaimer provision of a contract in a tort action brought to determine whether the entire contract is invalid because of alleged prior fraud which induced the execution of the contract. If the contract is invalid because of the antecedent fraud, then the disclaimer provision therein is ineffectual since, in legal contemplation, there is no contract between the parties.

*City Dodge, Inc. v. Gardner*, 232 Ga. 766, 797–98 (1974); *see also Hall v. Coram*

30

*Healthcare Corp.*, 157 F.3d 1286, 1289 (11th Cir. 1998) (under Georgia law, "the plaintiff can rescind the contract and sue in tort for alleged fraud, and the merger clause does not prevent introduction of parole evidence"). Because GunBroker has elected to rescind the Letter Agreement, it is not bound by the merger clause contained therein.

Nonetheless, the Court agrees with Tenor that GunBroker has failed to present evidence of either a false statement on Tenor's part or justifiable reliance on GunBroker's part. The Amended Complaint alleges two possible misstatements: (1) Tenor's representation before executing the Letter Agreement that the enterprise value of GunBroker could be as high as $200 million; and (2) Tenor's representation at Stage 1 that the enterprise value was at least $180 million. (Am. Compl. ¶ 70.) The first statement is not actionable because "speculation and projections of future events cannot form the basis for fraud in Georgia." *Seale v. Miller*, 698 F. Supp. 883, 900 (N.D. Ga. 1988). In his deposition, Urvan testified that Butler "was throwing around all kinds of numbers . . . verbally" prior to the Letter Agreement, including that GunBroker "could be over 200 million in enterprise value." (Urvan Dep. at 89:2–12.) But this was purely a projection, not a statement of existing fact, which Urvan couched in hypothetical language and delivered before Tenor had performed any valuation analysis of the Company.

The second statement is also not actionable because there is no evidence that Tenor's $180 million enterprise valuation of GunBroker was false or

inaccurate when made. At most, GunBroker's cited evidence shows that Tenor arrived at a different enterprise valuation than Comstock, but a *different* valuation is not equivalent to a *false* valuation.[6] As Tenor notes, enterprise value is not a single, static number but can fluctuate over time due to changes in business fundamentals, economic conditions, and other forces. (Reply Br. in Supp. of Def.'s Mot. for Partial Summ. J., at 16.) Because Comstock performed its alleged valuation approximately five months after Tenor, it is difficult to compare the two. (*Compare* Def.'s App'x, Ex. 6 at GB_000110, *with* Goselin Decl., Ex. B at CA-GB000137.) Further, even if the two valuations had been performed at the same time, there are different methods of calculating enterprise value that can produce different results. For example, Comstock used a discounted cash flow method and a capitalized cash flow method, with values ranging from as low as $115.4 million to as high as $158 million. (Goselin Decl., Ex. B at CA-GB000137.)

Finally, GunBroker has not shown that it justifiably relied on either of these alleged misstatements in pursuing the ESOP transaction. In its Stage 1 presentation, Tenor's $180 million enterprise valuation appeared under a section entitled "High Level Assumptions" and was explicitly labeled as

---

[6] As explained above, GunBroker has not properly authenticated the alleged Comstock "Enterprise Value Summary" document to be considered on summary judgment. However, the Court discusses the document here only to demonstrate that even if accepted as evidence, it still would not create a genuine issue of material fact as to whether Tenor's prior enterprise valuation was false or inaccurate.

"preliminary." (Def.'s App'x, Ex. 6 at GB_000119.) The presentation concluded with a disclaimer that:

> [t]he *actual outcome* of any ESOP transaction is *subject to negotiations* with lenders and the ESOP trustee and advisors thereof, but the analysis presented in this presentation is *reasonably indicative* of *probable terms* based upon the information you have provided to us and the *assumptions* indicated herein.

(*Id.* at GB_000143 (emphasis added).) This language sent a clear message to GunBroker and Urvan, an experienced businessman, that Tenor's valuation should not be relied upon as a guarantee of future ESOP transaction terms. In fact, the evidence shows that GunBroker shared this belief because it negotiated protections into the Letter Agreement in the event that the ESOP Trustee valued the Company below $165 million. Specifically, Paragraph 15 provides that "[i]f for any reason the enterprise valuation of the Company as determined by the ESOP trustee is less than $165 million dollars and the Company determines not to close an ESOP transaction at such lower valuation, [Tenor] shall have no right to payment under this paragraph." (Butler Dep., Ex. 22 at GB_000009.) Therefore, GunBroker was aware of the potential for differences between Tenor's valuation and the ESOP Trustee's valuation.

In opposition to summary judgment, GunBroker argues that (1) Butler played on his status as an attorney to gain GunBroker's business; (2) Butler and Schnabl represented that they had the expertise to determine the enterprise valuation and fair market value of the Company; (3) Butler and

Schnabl assured Urvan that his desired $165 million enterprise valuation would be achieved; and (4) Tenor made "no real, professional effort to determine the enterprise valuation."[7] (Pl.'s Br. in Opp'n to Def.'s Mot. for Partial Summ. J., at 38–39.) But GunBroker does not cite any record evidence to substantiate these generalized grievances, nor does it explain how these allegations create a genuine issue of material fact as to whether Tenor made any false statements or whether GunBroker reasonably relied on such statements. Therefore, the Court grants Tenor's Motion for Summary Judgment on GunBroker's Count VI for fraud in the inducement.

## C.  GunBroker's Count VIII: Negligent Misrepresentation

GunBroker moves for summary judgment on its Count VIII for negligent misrepresentation, which alleges that Tenor was negligent in providing a $180 million enterprise valuation for the Company. (Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 38.) According to GunBroker, it decided to pursue the proposed ESOP transaction and incurred $800,000 in professional fees in reliance on Tenor's valuation, but it had to abandon the deal when the ESOP Trustee valued the Company below $165 million. (*Id.* at 39.) Tenor also moves for summary judgment on this claim, arguing that its valuation was neither

---

[7] GunBroker also argues that "Tenor implicitly represented that it was in compliance with all applicable laws when it was not," and that "[t]his independently is fraudulent inducement." (Pl.'s Br. in Opp'n to Def.'s Mot. for Partial Summ. J., at 39.) However, these allegations do not appear in the Amended Complaint as a basis for GunBroker's fraudulent inducement claim. (Am. Compl. ¶¶ 69–78.)

false nor negligently performed, and that GunBroker's reliance thereon was not reasonable. (Def.'s Br. in Supp. of Def.'s Mot. for Partial Summ. J., at 23–24.) Because "[t]he same principles apply to both fraud and negligent misrepresentation cases," the Court concludes that Tenor is entitled to summary judgment for the same reasons provided as to GunBroker's fraudulent inducement claim. *Holmes v. Grubman*, 286 Ga. 636, 640–41 (2010) (citation and punctuation omitted).

"[T]o prove negligent misrepresentation, a plaintiff must show that (1) the defendant negligently supplied false information to foreseeable persons, known or unknown; (2) such persons reasonably relied upon that false information; and (3) economic injury proximately resulted from such reliance." *Bithoney*, 313 Ga. App. at 343 (quotation marks, citation, and punctuation omitted). GunBroker's claim fails on the first and second elements because, as described above, there is no evidence that Tenor's $180 million enterprise valuation was false, or that GunBroker reasonably relied on this valuation as a guarantee of ESOP transaction terms. GunBroker makes a related but distinct argument that Tenor mispresented "the extent and nature of [its] work in confirming an enterprise valuation of at least $180 million[.]" (Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 39.) However, GunBroker does not cite a single misrepresentation regarding the extent and nature of Tenor's valuation analysis. At most, GunBroker faults Tenor for not obtaining a "valuation opinion" or performing a "formal valuation" at Stage 1, (Pl.'s Br. in

Opp'n to Def.'s Mot. for Partial Summ. J., at 36), but Tenor neither agreed to do so in the Letter Agreement nor claimed to have done so when presenting its work. (Butler Dep., Ex. 22 at GB_000004 (agreeing to "perform a *preliminary*, *oral* valuation of the Company" (emphasis added)); Def.'s App'x, Ex. 6 at GB_000119.) Therefore, the Court grants Tenor's Motion for Summary Judgment on GunBroker's Count VIII for negligent misrepresentation.

## D. GunBroker's Count VII: Breach of Fiduciary Duty

Tenor moves for summary judgment on GunBroker's Count VII for breach of fiduciary duty, which alleges that Tenor sought to advance its business interests before the business interests of GunBroker. (Def.'s Br. in Supp. of Def.'s Mot. for Partial Summ. J., at 24.) GunBroker alleges that Tenor breached a fiduciary duty purportedly owed to it by (1) failing to provide an honest assessment of the enterprise value of GunBroker; (2) engaging in undisclosed side relationships with third parties, such as Quentin Lynch and Dealy; and (3) failing to inform GunBroker that Tenor was not registered with the SEC and/or with the Georgia Department of Securities. To support a breach of fiduciary duty claim, GunBroker must prove "the existence of such duty, breach of the duty, and damages proximately caused by the breach." *Megel v. Donaldson*, 288 Ga. App. 510, 515 (2007). Georgia "law does not create a confidential or fiduciary relationship between a financial institution and those with whom it deals." *Baxter v. Fairfield Fin. Servs., Inc.,* 307 Ga. App. 286, 293 (2010).

36

> A fiduciary or confidential relationship arises where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc. Such relationship may be created by law, contract, or the facts of a particular case.

*Megel*, 288 Ga. App. at 515–16. If such a relationship can be created by contract, it can be disclaimed by contract. The Letter Agreement states:

> It is understood and agreed that Tenor will act under this Agreement as an independent contractor with the duties solely to the Company. Nothing in this Agreement, express or implied, shall be deemed to create a fiduciary or agency relationship between Tenor and the Company or its stockholders or is intended to confer any relationship between any person or entity other than the parties hereto or their respective successors and assigns.

GunBroker agreed at the outset that it had no fiduciary relationship with Tenor. In response to the Motion for Summary Judgment, Gunbroker offers no evidence that would create a material issue of fact as to a fiduciary relationship. Accordingly, Tenor is entitled to summary judgment on GunBroker's Count VII.

### E. Tenor's Count II: Fraud

GunBroker moves for summary judgment on Tenor's Count II for fraud, which alleges that GunBroker induced Tenor to enter into the Letter Agreement with no present intent to honor its terms. (Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 33.) GunBroker argues that (1) Tenor has no evidence that GunBroker made any actionable misrepresentations; (2) Tenor

37

has no evidence that GunBroker intended to breach the Letter Agreement prior to its execution in November 2018; and (3) there is no proximate cause because Tenor terminated the Letter Agreement in February 2019. (*Id.*) Tenor counters that GunBroker made false representations in Paragraphs 3(b) and 15 of the Letter Agreement, in which it agreed to pay Tenor a success fee under specified circumstances. (Def.'s Br. in Opp'n to Pl.'s Mot. for Partial Summ. J., at 20.) Further, Tenor contends that Urvan questioned the ESOP Trustee's fees and Tenor's SEC registration in February 2019 only as a "pretext" "to remove Tenor from the deal, as it had planned all along." (*Id.* at 20–21.)

"Fraud cannot consist of mere broke promises, unfilled predictions or erroneous conjecture as to future events." *Fuller v. Perry*, 223 Ga. App. 129, 131 (1996). To be actionable as fraud, a representation of a future event must be "made with knowledge that it is false or intention not to perform[.]" *Id.* at 131–32. In the Court's view, the evidence does not support that GunBroker knew or intended to cut Tenor out of the ESOP transaction at the operative time: that is, prior to execution of the Letter Agreement. Urvan did not approach counsel about Tenor's compliance with securities laws until February 25, 2019, after Butler represented to Urvan that Tenor was acting as an investment bank in the transaction. (Urvan Dep. at 70:4–73:15; Urvan Dep., Ex. 50 at GB_000011.) While Tenor had held itself out as an investment bank in prior communications with GunBroker (*e.g.*, Def.'s App'x, Ex. 6 at GB_000111), it also labeled some documents provided to GunBroker as

38

attorney-client privileged. (*e.g.*, *id.* at GB_000110.) Further, Urvan testified that he only began to take note of securities laws, including licensing requirements, in December 2018 or January 2019 as a result of a separate lawsuit. (Urvan Dep. at 173:13–174:22.) Because Urvan's concerns arose well after the Parties executed the Letter Agreement in November 2018, they do not show prior knowledge or intent on GunBroker's part not to perform under the contract.[8]

Tenor cites a single email dated October 22, 2018, "as evidence of [GunBroker's] intent from the beginning[.]" (Def.'s Br. in Opp'n to Pl.'s Mot. for Partial Summ. J., at 21 n.6.) In the email, Urvan expressed to Butler that "I do not like a tail. If you fail to line the funding up or fail to line up funding at terms we like, then I am stuck." (Butler Dep., Ex. 19 at GB_001449.) According to Tenor, this statement demonstrates fraudulent intent because the referenced tail provision is "the exact fee [GunBroker] has dishonored." (Def.'s Br. in Opp'n to Pl.'s Mot. for Partial Summ. J., at 21 n.6.) However, following Urvan's objection, the Parties negotiated changes in this provision such that Tenor would receive no success fee if "the enterprise valuation of the Company as determined by the ESOP trustee is less than $165 million dollars and the

---

[8] Indeed, based on the Court's holding that Tenor meets the elements of an "investment adviser" under the Investment Advisers Act, GunBroker's concerns were legitimate and not a mere "pretext" to avoid paying Tenor a success fee. (*Contra* Def.'s Br. in Opp'n to Pl.'s Mot. for Partial Summ. J., at 21.)

Company determines not to close an ESOP transaction at such lower valuation[.]" (Butler Dep., Ex. 22 at GB_000009; *id.*, Exs. 95, 96, 99.) Tenor cannot convert evidence of transparent, arms'-length negotiations into evidence of a present intent not to honor the negotiated document.[9] *Cf. Infrasource*, 272 Ga. App. at 707–08. Therefore, the Court grants GunBroker's Motion for Summary Judgment on Tenor's Count II for fraud.

## F. Tenor's Count V: Unjust Enrichment

GunBroker moves for summary judgment on Tenor's Count V for unjust enrichment, which alleges that GunBroker accepted and benefited from Tenor's services without providing fair compensation. (Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 35.) According to GunBroker, Tenor did not convey any benefits related to the $65 million financing agreement because it did not have an actual relationship with MGG and did not perform most of the work to obtain the MGG term sheet. (*Id.* at 35–36.) GunBroker argues that Tenor's $12,500 fee at Stage 1 of the Letter Agreement is sufficient compensation, and that it must present evidence of additional benefits independent of the Letter Agreement. (*Id.*) Tenor counters that the $12,500 fee was expressly limited to the scope of work at Stage 1, and that it provided additional services to GunBroker in attracting and negotiating the financing

---

[9] If anything, these negotiations suggest that GunBroker would have *less* motive to abandon the Letter Agreement after negotiating a more favorable tail provision.

agreement with MGG, for which it is entitled to compensation. (Def.'s Br. in Opp'n to Pl.'s Mot. for Partial Summ. J., at 23–24.)

"[T]he theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated." *Clark v. Aaron's, Inc.*, 914 F. Supp. 2d 1301, 1309 (N.D. Ga. 2012) (quotation marks and citation omitted.) "Thus, the essential elements of the claim are that (1) a benefit has been conferred, (2) compensation has not been given for receipt of the benefit, and (3) the failure to so compensate would be unjust." *Id.* "The word 'benefit' denotes any form of advantage." *Jones v. White*, 311 Ga. App. 822, 828 (2011) (citation and punctuation omitted). "The measure of damages under . . . unjust enrichment is based upon the benefit conferred upon the recipient and not the cost to render the service or cost of the goods." *Hollifield v. Monte Vista Biblical Gardens, Inc.*, 251 Ga. App. 124, 130–31 (2001) (citation and punctuation omitted).

The Court agrees with Tenor that triable issues of fact remain on its unjust enrichment counterclaim. It is undisputed that the $12,500 paid to Tenor covered only its Stage 1 analysis, but GunBroker induced Tenor to do additional work related to the proposed ESOP transaction when it decided to pursue a financing raise. (Butler Dep. at 161:19–163:18.) While the Parties dispute the nature and extent of Tenor's work at this stage, the Court cannot resolve this dispute on summary judgment. According to GunBroker, Tenor

41

contributed little, if any, value to the financing agreement with MGG because Dealy (not Tenor) had the relationship with MGG and Cheskey (not Tenor) performed most of the work on the term sheet. (Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 36.) However, the evidence shows that Cheskey represented Tenor as a "director" throughout the financing raise. (Schnabl Dep., Ex. 88 at TCP 001080.) And Tenor contends that its relationships brought MGG to the table since Dealy reached out to MGG only after Tenor contacted Dealy about the transaction. (Dealy Dep. at 28:7–19, 32:22–34:7.)

Viewed in the light most favorable to Tenor, this evidence supports that (1) Tenor conferred a benefit on GunBroker by facilitating contact with MGG and negotiating a term sheet for the financing agreement, and (2) GunBroker did not compensate Tenor for this benefit when it paid $12,500 for its Stage 1 analysis. Therefore, the Court denies GunBroker's Motion for Summary Judgment on Tenor's Count V for unjust enrichment.

## G. Tenor's Counts III and IV: Attorneys' Fees and Punitive Damages

GunBroker moves for summary judgment on Tenor's Counts III and IV for attorneys' fees and punitive damages. (Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 36.) GunBroker contends that Tenor cannot recover its attorneys' fees because there is no genuine dispute that it has not acted in bad faith, has not been stubbornly litigious, and has not caused Tenor unnecessary trouble or expense. (*Id.*) In GunBroker's view, the fact that Tenor submitted a no-action letter to the SEC regarding broker-dealer registration requirements

42

validates its own concerns with Tenor's registration status. (*Id.* at 37.) Tenor counters that GunBroker exhibited bad faith and stubborn litigiousness when it (1) cut Tenor out of the financing deal and refused to pay its success fee and (2) used settlement discussions, scheduling conflicts, and delays as a ruse to file this lawsuit before Tenor could do the same. (Def.'s Br. in Opp'n to Pl.'s Mot. for partial Summ. J., at 24–25.) With respect to punitive damages, both Parties agree that such damages are only available in connection with Tenor's fraud counterclaim. (*Id.* at 25; Reply Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 19.)

Because the Court has granted summary judgment to GunBroker on Tenor's breach of contract and fraud counterclaims, GunBroker is also entitled to summary judgment on Tenor's Count III for attorneys' fees as to those counterclaims and on Tenor's Count IV for punitive damages. That leaves only Tenor's unjust enrichment counterclaim as a potential basis for attorneys' fees. Pursuant to O.C.G.A. § 13-6-11, a plaintiff may recover litigation expenses "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense[.]" "[S]tatutory recovery for stubborn litigiousness or causing unnecessary trouble and expense is authorized if there exists no bona fide controversy or dispute regarding liability for the underlying cause of action." *David G. Brown, P.E., Inc. v. Kent*, 274 Ga. 849, 850 (2002) (citation omitted). Whether there exists a bona fide controversy or dispute on a claim, and whether a litigant has acted in bad faith

or been stubbornly litigious, are questions of fact for the jury. *See Rigby v. Flue-Cured Tobacco Coop.*, 327 Ga. App. 29, 41 (2014); *Webster v. Brown*, 213 Ga. App. 845, 846 (1994). Therefore, the Court denies GunBroker's Motion for Summary Judgment on Tenor's Count III for attorneys' fees as to its unjust enrichment counterclaim. *See, e.g.*, *Rigby*, 213 Ga. App. at 42 (advancing a claim for attorneys' fees to trial when the claim upon which it is based also proceeds to trial).

## IV.   Conclusion

For the reasons set forth above, Tenor's Motion for Partial Summary Judgment [Doc. 75] and GunBroker's Motion for Partial Summary Judgment [Doc. 87] are GRANTED in part and DENIED in part.

SO ORDERED, this ____3rd____ day of November, 2021.

THOMAS W. THRASH, JR.
United States District Judge