IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TENOR CAPITAL PARTNERS, LLC,

Plaintiff,

v.

GUNBROKER.COM, LLC,

Defendant.

CIVIL ACTION FILE
NO. 1:20-CV-613-TWT

## OPINION AND ORDER

This is a financing deal gone bad. It is before the Court on the Defendant's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial [Doc. 200], the Defendant's Motion for a New Trial [Doc. 201], and the Defendant's Motion to Alter or Amend the Judgment [Doc. 202]. For the reasons set forth below, the Court DENIES the Defendant's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial [Doc. 200], DENIES the Defendant's Motion for a New Trial [Doc. 201], and DENIES the Defendant's Motion to Alter or Amend the Judgment [Doc. 202].

## I.    Background

The Defendant, GunBroker.com, LLC, originally filed this action seeking to rescind a financial advisory contract with the Plaintiff, Tenor Capital Partners, LLC, under federal and state securities laws. The purpose of the contract, called the "Letter Agreement," was for Tenor to advise GunBroker

and its sole shareholder, Steve Urvan, on the potential establishment of an employee stock ownership plan ("ESOP"). *See GunBroker.com, LLC v. Tenor Capt. Partners, LLC*, 2021 WL 5113200, at *1-2 (N.D. Ga. Nov. 3, 2021). Tenor's services were to be performed in three sequential stages: (1) Analysis and Structuring Stage ("Stage 1"), (2) Financing Raise Stage ("Stage 2"), and (3) Closing Stage ("Stage 3"). *See id.* at *2. In November 2018, as part of its Stage 1 analysis, Tenor performed preliminary valuation work on GunBroker's business and presented Urvan with alternative transactions to an ESOP, such as selling to a strategic or financial buyer. *See id.* at *3. Satisfied with Tenor's financial projections, GunBroker instructed Tenor to proceed to Stage 2 of the Letter Agreement to raise the financing needed for an ESOP. *See id.* at *4. Over the next few months, Tenor prepared and circulated a financing memorandum to at least 22 potential lenders and negotiated a term sheet with one lender, MGG Investment Group, LP, for a loan of up to $70 million. *See id.*

Shortly after the MGG term sheet was executed, the relationship between GunBroker and Tenor deteriorated over a fee dispute. *See id.* at *4-5. Specifically, Urvan questioned why he had to pay lawyers, trustees, and lenders in addition to Tenor to close an ESOP, complaining that "the deal is far too expensive." *Id.* at *5 (citation omitted). At this time, Urvan also confronted Tenor about its lack of a broker-dealer license and asked whether Tenor was operating under a registration exemption. *See id.* Todd Butler, one of Tenor's principals, declined to respond to Urvan, interpreting his questions

2

as a ploy to renegotiate Tenor's fee. *See id.* Tenor and GunBroker stopped working together at the end of February 2019, although the parties did not execute a formal termination agreement, and GunBroker then hired new financial, legal, and other professional services firms to continue pursuing an ESOP. *See id.* at *6. Those efforts eventually failed when the ESOP trustee failed to make a satisfactory offer (in Urvan's mind) to purchase Urvan's GunBroker stock. *See id.* at *7. After scrapping the ESOP transaction, GunBroker still closed a $65 million loan with MGG, which prompted Tenor to send GunBroker a $1.05 million invoice for its work securing the MGG financing. *See id.* GunBroker never paid the invoice. *See id.*

On February 10, 2020, GunBroker sued for rescission of the Letter Agreement based on Tenor's failure to register as an investment adviser or a broker-dealer under the Investment Advisers Act, the Securities Exchange Act, and the Georgia Uniform Securities Act. *See id.* In the alternative, to the extent the Letter Agreement was a valid and enforceable contract, GunBroker alleged that Tenor breached the contract by abandoning their engagement in February 2019. *See id.* GunBroker also brought claims against Tenor for fraud in the inducement, breach of fiduciary duty, negligent misrepresentation, and recoupment. *See id.* Tenor answered with its own counterclaims for breach of contract, fraud, unjust enrichment, attorney's fees, and punitive damages. *See id.* On summary judgment, the Court found in favor of GunBroker on its rescission claim under the Investment Advisers Act, concluding that at Stage

3

1 of the Letter Agreement, Tenor agreed to (and in fact did) act as an investment adviser without the required registration. *See id.* at *9-11. Therefore, the Court held, the Letter Agreement was void. *See id.* at *11. With respect to the parties' remaining claims, the Court dismissed all but Tenor's claims for unjust enrichment and attorney's fees. *See id.* at *11-17.

The case proceeded to trial the week of May 16, 2022, on Tenor's two surviving claims. The jury returned a verdict in favor of Tenor on the unjust enrichment claim and in favor of GunBroker on the attorney's fees claim. The jury awarded Tenor $1.5 million in damages, and judgment was entered in that amount, plus costs and interest. During the trial, GunBroker moved for a directed verdict on the grounds that Tenor could not recover in unjust enrichment for any services performed under a void contract. (Def.'s Mot. for Directed Verdict, at 2.) The Court denied the motion. Because Tenor did not seek compensation for its unlicensed investment advice, the Court concluded that its unjust enrichment claim could be "severed" from the illegal parts of the Letter Agreement. *See Tenor Cap. Partners, LLC v. GunBroker, com, LLC*, 2022 WL 1620432, at *1 (N.D. Ga. May 23, 2022). Now, GunBroker renews its demand for judgment as a matter of law on Tenor's unjust enrichment claim. (Def.'s Mot. for Judgment as a Matter of Law, at 3-11.) In the alternative, GunBroker requests a new trial to redress possible juror misconduct and some of the Court's evidentiary rulings and jury instructions. (Def.'s Mot. for a New Trial, 1-20.) Finally, GunBroker asks the Court to reduce the amount of the

4

judgment because the jury verdict of $1.5 million is excessive in light of the evidence. (Def.'s Mot. to Alter or Amend the Judgment, at 1-2.)

## II.   Legal Standard

Under Federal Rule of Civil Procedure 50, a party is entitled to judgment as a matter of law if the non-moving party "has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on that issue[.]" Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law may be made any time before the case is submitted to the jury and may be timely renewed after the jury has returned its verdict. *Id.* 50 (a)-(b); *see also Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007). When considering a Rule 50 motion, "a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." *Chaney*, 483 F.3d at 1227. Even on a renewed motion under Rule 50(b), the Eleventh Circuit has instructed that "a court's sole consideration of the jury verdict is to assess whether that verdict is supported by sufficient evidence." *Id.* The jury's particular findings are not germane to the legal analysis, and the court cannot consider matters not originally raised in the pre-verdict motion. *See id.* at 1228. If a court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed. Fed. R. Civ. P. 50(c).

Rule 59(a) authorizes a court, following a jury trial, to grant a new trial "to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). Although not an exhaustive list, a motion for a new trial may rest on claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). "Generally, motions for a new trial are committed to the discretion of the district court." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). A party may also move under Rule 59(e) "to alter or amend a judgment[.]" Fed. R. Civ. P. 59(e). A Rule 59(e) motion may not be used "to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Michael Linet, Inc. v. Vill. of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005). Rather, there are four appropriate grounds upon which to reconsider a judgment: (1) to correct manifest errors of law or fact, (2) to prevent manifest injustice, (3) to account for an intervening change in controlling law, and (4) to allow the moving party to present newly discovered or previously unavailable evidence. 11 Wright & Miller, Federal Practice and Procedure § 2810.1 (3d ed. Apr. 2022 update).

## III.   Discussion

### A.  Motion for Judgment as a Matter of Law

As explained above, GunBroker moved at trial for a directed verdict on Tenor's unjust enrichment claim. The basis for that motion was a purported Georgia rule that "when a contract has been declared void as a violation of public policy, a claim for unjust enrichment fails as a matter of law when it is based on the underlying factual transaction and activities which were the subject of the contract." (Def.'s Mot. for Directed Verdict, at 2.) Because the Court found the Letter Agreement void for violating the Investment Advisers Act, GunBroker argued that "so too [were] any services rendered thereunder." (*Id.* at 4-5.) Disagreeing, the Court emphasized that Tenor did not "require any help from its investment advisory services to establish its case for unjust enrichment." *Tenor Cap.*, 2022 WL 1620432, at *1. That is because Tenor sought to recover solely for its work soliciting and negotiating the MGG term sheet, which is not an activity covered by the Investment Advisers Act. *See id.* So, under the test articulated in *Five Star Athlete Management, Inc. v. Davis*, 355 Ga. App. 774, 778 (2020), the Court held that Tenor's unjust enrichment claim was severable from the Letter Agreement and thus appropriately submitted to the jury. *See Tenor Cap.*, 2022 WL 1620432, at *1.

In its Renewed Motion for Judgment as a Matter of Law, GunBroker argues that the May 23rd Order misinterpreted and misapplied Georgia law. (Def.'s Mot. for Judgment as a Matter of Law, at 4.) In cases like this one,

GunBroker insists that the "pertinent analysis" is "whether the void, illegal activity is 'collateral' or 'remotely connected' to the 'essence of the contract.'" (*Id.* at 5-6.) In other words, the entire contract is rendered unenforceable if the essence of the contract—or, put differently, the "nature" or the "object or purpose" of the contract—is illegal. (*Id.* at 4-5 (quoting *Remediation Servs., Inc. v. Georgia-Pacific Corp.*, 209 Ga. App. 427, 433 (1993); *Smith v. Saulsbury*, 286 Ga. App. 322, 323 (2007)).) Here, GunBroker claims that the essence of the Letter Agreement was "to provide investment advice in connection with the sale of securities for an ESOP [t]ransaction." (*Id.* at 8; *see also* Reply Br. in Supp. of Def.'s Mot. for Judgment as a Matter of Law, at 8.) So, the argument goes, "[t]he illegal investment advice [was] neither collateral nor remote" to the Letter Agreement, and no part of the contract—in particular the financing raise at Stage 2—can be carved out and enforced separately from the rest. (Def.'s Mot. for Judgment as a Matter of Law, at 9.)

First, the Court disagrees with GunBroker's self-serving characterization of the Letter Agreement. The purpose of the contract was not to provide investment advice above all else; it was to provide an array of "financial advisory services" related to GunBroker's "potential installation of an [ESOP] and the financing thereof[.]" (Def.'s Trial Ex. 4 ¶ 1.) As mentioned above, those services were divided into three successive, independent phases. Although the first phase did involve some investment advice, the evidence shows that it lasted only eight days and featured a different compensation

structure (*i.e.*, a flat fee of $12,500) than the latter two phases. (Trial Tr., Vol. I at 123:17-127:1; *id.*, Vol. II at 109:1-7 (Urvan testified at trial that Stage 1 "was pretty quick.").) By contrast, Tenor's efforts to secure financing lasted approximately three months and might have continued longer if not for the parties' abrupt fee dispute. (Trial Tr., Vol. I at 132:3-24, 184:3-185:1; *id.*, Vol. II at 4:24-6:2, 9:7-10:16; *id.*, Vol. III at 50:21-51:10.) Also, Tenor stood to earn up to seven figures under the contractual success fee for its financing and closing activities had the ESOP come to fruition or, as here, had GunBroker opted for a stand-alone financing deal. (Def.'s Trial Ex. 4 ¶ 3(b).) Given the segmented structure of the Letter Agreement and the greater weight (*i.e.*, duration and compensation) placed on the financing raise, the Court cannot say that Tenor's limited investment advice was the overriding purpose of the contract.

GunBroker's authorities further support this conclusion. GunBroker cites a string of cases involving contracts that either did not have an illegal purpose, *see Saulsbury*, 286 Ga. App. at 324; *Shannondoah, Inc. v. Smith*, 140 Ga. App. 200, 202 (1976), or contained illegal provisions that were severable from the whole, *see Fears v. Auto Reflections, Inc.*, 2018 WL 4846531, at *2 (N.D. Ga. Feb. 8, 2018); *Nolley v. Md. Cas. Ins. Co.*, 222 Ga. App. 901, 904 (1996); *Adams v. Tr. Co. Bank*, 206 Ga. App. 554, 556 (1992). (Def.'s Mot. for Judgment as Matter of Law, at 5-6.) These cases stand for the proposition that "a contract may be severed if 'the failure of a distinct part does not void the

9

remainder.'" *Nolley*, 222 Ga. App. at 904 (quoting O.C.G.A. § 13-1-8(a)). "Whether a contract is severable or entire is determined by the intention of the parties. The parties' intent may be expressed directly, through a severability clause, or indirectly, as when the contract contains promises to do several things based upon multiple considerations." *Fears*, 2018 WL 4846531, at *2. Of course, the Letter Agreement does include a severability clause, stating: "The invalidity or enforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect." (Def.'s Trial Ex. 4 ¶ 7.) So, under GunBroker's own authorities, the illegality of the Stage 1 investment advice should not invalidate the Stage 2 financing raise. On reply, GunBroker dismisses the severability clause as a "*non sequitur*" since this case involves an unjust enrichment claim, not a contract claim. (Reply Br. in Supp. of GunBroker's Mot. for Judgment as a Matter of Law, at 9.) But it was GunBroker that brought up these cases in the first place; it should not be allowed to have its cake and eat it too.

Second, the Court is concerned that GunBroker's singular focus on the contractual essence misses the forest for the trees. While the Court relied heavily on *Five Star Athlete* in the May 23rd Order, that opinion does not contradict GunBroker's current position and in fact invoked the same legal principles as GunBroker does now. As explained in *Five Star Athlete*:

10

- "A quantum meruit recovery may be prohibited where the nature of the contract itself rendered it entirely void for being in contravention of public policy in its totality." *Five Star Athlete*, 355 Ga. App. at 776 (quoting *Remediation Servs.*, 209 Ga. App. at 434).

- "In Georgia, a contract to do an illegal thing is void. . . . The prohibition does not apply where the object of the contract is not illegal or against public policy, but where the illegality is only collateral or remotely connected to the contract." *Id.* (quoting *Saulsbury*, 286 Ga. App. at 323-34).

- "Georgia courts have long held that where the illegality of a contract is only collateral or remotely connected with the contract, the part of the contract that is based on legal and binding consideration is severable and may nevertheless be enforceable." *Id.* at 778.

Then—and this part is critical—the court translated these general pronouncements into an actionable "test for determining whether a demand connected with an illegal transaction is capable of enforcement at law[.]" *Id.* (citation omitted). Under that test, the sole consideration is "whether [the] plaintiff requires *any aid* from the illegal transaction to establish his case." *Id.* (emphasis added) (citation omitted). The "any-aid" test, which the Court held preserved Tenor's unjust enrichment claim, thus derives straight from GunBroker's preferred authorities. Put simply, GunBroker has no grounds to claim that the May 23rd Order "does not reflect the pertinent legal principles under Georgia law." (Def.'s Mot. for Judgment as a Matter of Law, at 4.)

GunBroker also takes issue with how the Court interpreted the phrase "his case" in the "any-aid" test. According to GunBroker, "his case" does not refer to the plaintiff's substantive claim—here, Tenor's unjust enrichment

11

claim—but to "the 'nature of the underlying contract itself' and 'object and purpose' of the underlying contract." (Reply Br. in Supp. of Def.'s Mot. for Judgment as a Matter of Law, at 4-5.) Not only is this interpretation implausible as a simple linguistic exercise, but it also cannot be squared with *Five Star Athlete*. There, after the court recited the "any-aid" test, it considered what evidence the plaintiff had, apart from his illegal activities, "to establish his *claim*" for quantum meruit. *Five Star Athlete*, 355 Ga. App. at 778 (emphasis added). This Court engaged in the same inquiry with respect to Tenor's evidence. To repeat, Tenor presented evidence at trial regarding its "efforts to obtain financing for GunBroker[] to complete an ESOP transaction— namely contacting its network of regulated and unregulated lenders and negotiating a term sheet on behalf of GunBroker[]." *Tenor Cap.*, 2022 WL 1620432, at *1. Accordingly, the Court determined that Tenor did not "require any help from its investment advisory services to establish its case for unjust enrichment." *Id.*

But this conclusion, GunBroker argues, was also improper. According to GunBroker, there can be no unjust enrichment in Georgia unless the plaintiff (*i.e.*, the party conferring the benefit) "act[s] with the expectation that the other will be responsible for the cost." *Price & Co. v. Majors Mgmt., LLC*, 363 Ga. App. 427, 436 (2022). Applied to this case, GunBroker claims that:

> [Tenor's] expectation of compensation solely arose from GunBroker's authorization to proceed with the Stage 2 [f]inancing [r]aise. Authorization would not have been granted without the

> illegal investment advice in Stage 1. The illegal investment advice
> unequivocally "aided" Tenor's Stage 2 activities and thus, "aided"
> the claim for unjust enrichment.

(Reply Br. in Supp. of Def.'s Mot. for Judgment as a Matter of Law, at 9-10.) In

other words, GunBroker says, "without the illegal conduct there would have

been no need to obtain a loan and thus no further work by Tenor." (Def.'s Mot.

for Judgment as a Matter of Law, at 10.) However, Tenor did submit evidence

that it undertook the financing raise with the expectation of being paid. Butler

testified that arranging financing for clients is "one of the most important

functions of [Tenor's] business" and that Tenor's usual fee on a financing deal

is 1.5 percent of the loan amount. (Trial Tr., Vol. I at 105:11-106:21.) Indeed,

the Letter Agreement contained a tail provision under which Tenor could be

paid even if GunBroker closed a straight debt transaction without an ESOP.

(Def.'s Trial Ex. 4 ¶ 15.) Although, as GunBroker argues, Tenor's investment

advice may have helped to bring about Stage 2, no evidence of that advice was

needed to establish the "expectation" element of its unjust enrichment claim.

For example, there was no suggestion, absent the disputed evidence, that

Tenor volunteered for free to secure a lender and negotiate loan terms on

GunBroker's behalf. *See, e.g.*, *Hollifield v. Monte Vista Biblical Gardens, Inc.*,

251 Ga. App. 124, 131 (2001).

Again, GunBroker's authorities do not compel a different outcome.

(Def.'s Mot. for Judgment as a Matter of Law, at 3, 6-7.) In *Five Star Athlete*,

the plaintiff, who claimed to represent football player Fletcher Cox, steered

13

Cox to sign a professional contract with the Five Star sports agency. *See Five Star Athlete*, 355 Ga. App. at 775. When the plaintiff sued Five Star for a commission under their alleged oral contract, Five Star successfully argued that the contract was void and unenforceable because the plaintiff was not registered as an athlete agent under Mississippi law. *See id.* at 775-76. On appeal, the Georgia Court of Appeals also held that the plaintiff could not recover on a theory of quantum meruit:

> Although [the plaintiff] argues that even if this Court concluded that some portions of the agreement were void for illegality, [he] could still be entitled to seek recovery for providing "intelligence regarding Cox's recruiting process and arranging critical meetings (between Five Star and Cox)," *this is the type of illegal conduct prohibited by the Agent Act.* . . . In the present case, the only evidence proffered by [the plaintiff] to establish his claim is evidence of [his] illegal recruiting activities."

*Id.* at 777-78 (emphasis added). Similarly, in *JR Construction/Electric, LLC v. Ordner Construction Co.*, 294 Ga. App. 453, 455-56 (2008), a subcontractor could not pursue an unjust enrichment claim for the exact services— unlicensed electrical work—that had rendered the underlying contract void. The same occurred in *O'Neal v. Home Town Bank of Villa Rica*, 237 Ga. App. 325, 328-29 (1999): there, a bank executive sued in quantum meruit to recover compensation for creating a bank, but the claim failed because Georgia law expressly prohibits banks from paying a fee in connection with their organization.

14

By contrast, Tenor's unjust enrichment claim was narrowly premised on advisory services that do not require registration (and thus are not illegal) under the Investment Advisers Act. This fact also sets apart the federal securities cases cited by GunBroker. (Def.'s Mot. for Judgment as a Matter of Law, at 10-11.) In *Lawrence v. The Richman Group Capital Corp.*, 2005 WL 3448056, at *1 (D. Conn. Dec. 15, 2005), the plaintiff agreed to solicit investors for the defendants' real estate funds and then sued the defendants for allegedly breaching an exclusivity agreement. The court declared the contract void because the defendants were not registered broker-dealers under the Securities Exchange Act and consequently, the plaintiff was not a registered representative of the defendants. *See id.* at *1, 3 n.6. The plaintiff's unjust enrichment claim, the court held, also failed since it sought compensation for activities prohibited by federal law: specifically, "sales activities as a broker marketing securities for an unregistered broker-dealer." *Id.* at *3. GunBroker's two other cases—*EdgePoint Capital Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 59-63 (1st Cir. 2021), and *Regional Properties, Inc. v. Financial & Real Estate Consulting Co.*, 678 F.2d 552, 564 (5th Cir. 1982)— likewise found that unregistered broker-dealers were not entitled to fees for illegally marketing securities. Factual distinctions aside, these cases also were not decided under Georgia law, which even GunBroker agrees must govern Tenor's unjust enrichment claim. (Reply Br. in Supp. of Def.'s Mot. for Judgment as a Matter of Law, at 5-6.) So, for the foregoing reasons, the Court

15

declines to enter judgment as a matter of law in GunBroker's favor.[1]

## B. Motion for a New Trial

Next, GunBroker moves for a new trial to redress four errors that it argues tainted the jury verdict: (1) possible juror misconduct, (2) the admission of prejudicial evidence regarding GunBroker's sale to Ammo, Inc., (3) the failure to instruct the jury on GunBroker's Proposed Jury Charges Nos. 41 and 42, and (4) the decision to give the Court's Investment Advisers Act Charge. (Def.'s Mot. for a New Trial, at 1.) The Court addresses each ground for a new trial in turn.

### i. Allegations of Juror Misconduct

In a declaration filed with the Motion for a New Trial, GunBroker's counsel Jeffrey Paul Lutz states that he received a phone call on May 24, 2022—four days after the jury returned its verdict—from an untraceable phone number. (Lutz Decl. ¶ 4.) The voice on the other line, Lutz approximates, belonged to a woman who sounded neither "young nor aged." (*Id.* ¶ 5.) She asked if Lutz was one of the attorneys involved in a recent trial in federal court, to which he responded yes. (*Id.*) According to Lutz's verbatim recollection of the

---

[1] In the Motion for Judgment as a Matter of Law, GunBroker also argues that the Court erred in giving its "Investment Advisers Act Charge" (Trial Tr., Vol. V at 89:10-90:14) and in rejecting GunBroker's Proposed Jury Charge No. 37. (Def.'s Mot. for Judgment as a Matter of Law, at 11-13.) Because an identical argument appears in GunBroker's Motion for a New Trial, the Court will address it in that section of the Opinion and Order.

conversation, the caller informed him:

> I don't know how to exactly tell you this, but I was outside the
> Courthouse last week and I heard the paralegal for the Plaintiff
> in your case bragging about her relationship with the jury
> foreman. . . . I think you need to investigate an improper jury
> relationship with Plaintiff's counsel.

(*Id.* ¶ 6.) The caller, Lutz continues, overhead the paralegal call the jury

foreman a "close friend" and indicate that they had worked together at

"Weinberg." (*Id.* ¶ 10.) The caller insisted that she "did not want to give her

name out, or have any further involvement, but that what she heard had

weighed on her so much over the weekend that she thought somebody needed

to know, and so she looked up [Lutz's] contact information." (*Id.* ¶ 11.) In

response to Lutz's questions, the caller confirmed that the alleged conversation

occurred on Friday (the day of the verdict) and that she neither served on the

jury nor worked for the court. (*Id.* ¶ 13.)

The paralegal in question, Lutz infers, was Carla Foster, who was

present throughout the trial with the lawyers from the firm of Robbins, Alloy,

Belinfante, Littlefield, LLC. (*Id.* ¶ 7.) The jury forewoman was Joy Gragg. (*Id.*

¶ 8.) After receiving the anonymous call, Lutz claims that he researched both

individuals and found that Foster and Gragg overlapped as paralegals at the

same law firm, Weinberg Wheeler Hudgins Gunn & Dial, for up to three years.

(*Id.* ¶ 9.) Attached to Lutz's declaration are LinkedIn profiles and

BeenVerified.com reports for Foster and Gragg; in the bottom right-hand

corner of the LinkedIn attachments, there is a circular profile picture depicting

Urvan, not Lutz. (Lutz Decl., Exs. A & B.) During *voir dire*, Tenor asked the jury pool the following questions about their personal connections to and interest in the parties, the attorneys, and the case:

1.  Do any of you know any of the lawyers or any of the parties?

2.  Is there any reason that you're aware of, whatever it might be, where you don't think you could decide fairly, either because of one of the parties or because of your views on the law or, really, any other reason that would prevent you—both sides, obviously, have an interest in being sure that the jurors are fair and impartial.

(Trial Tr., Vol. I at 25:15-17, 27:20-25.) Gragg did not respond to either question. In opposition to the Motion for a New Trial, Tenor submits a declaration from Foster, who admits to having worked with Gragg in the past but denies that the conversation described in Lutz's declaration ever occurred. (Foster Decl. ¶¶ 5, 8.)

To obtain a new trial for juror misconduct that occurred during the jury selection process, a party must make two showings: "(1) that a juror failed to answer honestly a material question on *voir dire*, and (2) that a correct response would have provided a valid basis for a challenge for cause." *Torres v. First Transit, Inc.*, 979 F.3d 876, 882 (11th Cir. 2020) (quotation marks and citation omitted). The first prong "requires a determination of whether the juror's answers were honest." *Id.* (citation omitted). And the second prong requires "a showing of actual bias . . . either by express admission or by proof of specific facts showing such a close connection to the circumstances at hand

18

that bias must be presumed." *Id.* (quotation marks and citation omitted). "When allegations of juror misconduct surface after trial, the investigation of the alleged misconduct is committed to the discretion of the district court[.]" *Id.* (quotation marks and citation omitted). A district court need not investigate all claims of juror misconduct before resolving a motion for a new trial, but that discretion is removed when "the party alleging misconduct makes an 'adequate showing' of evidence to overcome the presumption of jury impartiality." *Id.* (quotation marks and citation omitted). That is, a district court must investigate when presented with "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred." *Id.* at 883 (citation omitted).

The Court is satisfied that it can decide the Motion for a New Trial on the current record, without conducting the kind of invasive investigation demanded by GunBroker.[2] *See id.* at 882 ("[A]n evidentiary hearing is not required if the record contains all the evidence needed to dispose of each of the grounds asserted as a basis for a new trial." (quotation marks, citation, and brackets omitted)). The allegations in Lutz's declaration, even if corroborated

---

[2] Specifically, in the "initial stages" of the investigation, GunBroker seeks "targeted information," such as work emails, from the Weinberg Wheeler firm to determine the extent to which Foster and Gragg "worked together" and behaved as "close friends." (Def.'s Mot. for a New Trial, at 10.) GunBroker also requests "targeted discovery" of Foster's personal email accounts and text messages and for Foster to be questioned under oath about her communications with Gragg. (*Id.* at 10-11.)

by additional evidence, cannot establish the first prong of the juror misconduct standard: that Gragg gave a dishonest answer or non-disclosure during jury selection. The first question cited by GunBroker—whether the jurors knew any of the lawyers or parties—did not encompass Foster, a paralegal, and GunBroker makes no suggestion that Gragg was familiar with the attorneys representing Tenor from the Robbins firm. The second question asked the jurors to disclose any reasons that would prevent them from rendering a fair and impartial verdict. Assuming Gragg recognized Foster in the courtroom, nobody can dispute her subjective belief that their prior relationship would not impact her decision-making as a juror. In any event, Gragg repeatedly identified herself as a paralegal on *voir dire*, and GunBroker never bothered to ask a follow-up question about where and with whom she had worked for (or against) during her career. (Trial Tr., Vol. I. at 22:21-22, 40:14-18.) GunBroker's own lack of thoroughness at that time, the Court finds, does not warrant an intrusive investigation into so-called juror misconduct now, much less a new trial.

### ii.  Evidence of GunBroker's Sale to Ammo

In May 2021, GunBroker was acquired by Ammo, a company which produces and distributes ammunition and firearm components, in a deal worth about $244 million. Before trial, GunBroker filed a motion in limine to exclude all evidence of the acquisition, arguing that it was irrelevant to the events underlying Tenor's unjust enrichment claim and would prejudice the jury into

believing that GunBroker had the means to pay Tenor. (Def.'s Mot. in Limine, at 3-4.) The Court denied the motion—but only "for now." (Order of May 13, 2022, at 1.) In the Motion for a New Trial, GunBroker claims that Tenor raised the Ammo transaction at trial for an improper purpose: namely to paint Urvan as a wealthy individual who did not care for GunBroker's employees. (Def.'s Mot. for a New Trial, at 12.) That use, GunBroker argues, maximized the evidence's prejudicial impact and offered no probative value as to any benefit delivered by Tenor with the MGG term sheet. (*Id.* at 13-14.) In GunBroker's view, no evidence of the sale should have been admitted under Federal Rule of Evidence 403, and the Court should vacate the judgment and order a new trial on that basis. (*Id.* at 14.)

First, the Court concludes that GunBroker failed to preserve its right to challenge this matter. Again, the Court denied GunBroker's pretrial motion to exclude evidence of the Ammo deal without prejudice (*i.e.*, "for now"), allowing GunBroker to renew its pretrial objections or raise new objections to the evidence at trial. And in fact, GunBroker did make one such objection: the Court *granted* GunBroker's request to exclude Exhibit 198—the "Agreement and Plan of Merger" among Urvan, his entities, and Ammo—because it was cumulative of Urvan's oral testimony. (Trial Tr., Vol. IV at 179:4-7.) Otherwise, as Tenor emphasizes (and GunBroker does not contest), GunBroker did not object to any evidence, questions, or testimony related to the sale, nor did GunBroker request a limiting instruction from the Court to define the proper,

21

nonprejudicial scope of the evidence. Under these circumstances, where a pretrial evidentiary objection is denied without prejudice but not raised again at trial, courts regard the objection as waived. *See, e.g.*, *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1005-06 (9th Cir. 2020) ("If . . . there is an indication that the [evidentiary] objection might be subject to reconsideration, or if the disputed evidence is introduced in an unforeseen way at trial that casts doubt on the applicability of the court's *in limine* ruling, then we do not treat the district court's *in limine* ruling as definitive, and the party must renew the objection to preserve it for appeal." (quotation marks and citation omitted)); *United States v. Valenti*, 60 F.3d 941, 944-45 (2d Cir. 1995) (holding that a party must renew pretrial objections to evidence "when the trial judge had earlier stated that he would reserve judgment until he heard the trial evidence"); *United States v. Khoury*, 901 F.2d 948, 966 (11th Cir. 1990) ("A defendant must object at trial to preserve an objection on appeal; the overruling of a motion in limine does not suffice.").

Second, the Court agrees with Tenor that some evidence of the Ammo deal was relevant to its unjust enrichment claim. Under Rule 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. "The district court possesses broad discretion to admit evidence if it has any tendency to prove or disprove a fact in issue." *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006) (citation omitted).

At trial, Butler, Urvan, and Andre Schnabl, Tenor's other principal, testified that Tenor negotiated a revised prepayment provision with MGG, at Urvan's request, which reduced the prepayment penalty on the loan in the event of a "change of control" (*i.e.*, if GunBroker were sold to a third party). (Trial Tr., Vol. I at 159:20-160:14; *id.*, Vol. III at 25:6-26:18, 125:11-127:15; *id.*, Vol. IV at 77:4-22.) The revised provision was structured with a two-year horizon, saving GunBroker $1.3 million if the loan was prepaid within one year and up to $4.5 million if the loan was prepaid between one and two years. (*Id.*, Vol. I at 163:18-164:15; Pl.'s Ex. 156.) During closing arguments, Tenor connected the dots between that provision, the Ammo deal, and the unjust enrichment claim: because Ammo acquired GunBroker within 24 months of closing the MGG loan (Trial Tr., Vol. II at 98:2-10, 170:18-20), GunBroker was able to reap the millions of dollars in savings negotiated by Tenor (and consequently should have to compensate Tenor for that benefit). (*Id.*, Vol. V at 65:20-66:7.)

Further, Tenor argues that the Ammo deal was relevant to show that the financing raise was the primary focus of the Letter Agreement, even unaccompanied by an ESOP. (Pl.'s Br. in Opp'n to Def.'s Mot. for a New Trial, at 16-17.) On cross-examination, Tenor questioned Urvan about different methods to "monetize" GunBroker—or, in other words, to extract value from the business for its shareholders. (Trial Tr., Vol. II at 102:19-103:17.) As Urvan acknowledged, one option would be to sell GunBroker to a third party for cash plus stock; another would be to sell GunBroker to an ESOP, whereby Urvan

23

would receive an initial down payment and the remaining purchase price over time; and still another would be for GunBroker to take on debt and distribute cash to Urvan. (*Id.*, Vol. II at 102:19-105:17.) Ultimately, Urvan and GunBroker selected the first and third options. GunBroker closed the $65 million loan with MGG in May 2019, which paid off existing debt and sent $15 million to an investment entity owned by Urvan. (*Id.*, Vol. II at 20:19-21:7; *id.*, Vol. IV at 166:22-167:11.) And Ammo purchased GunBroker in May 2021. With respect to the latter transaction, Tenor asked Urvan whether GunBroker had an ESOP in place at the time of the sale and relatedly, whether GunBroker's employees received any consideration for the company's stock. (*Id.*, Vol. II at 98:11-21.) The answer was no since Urvan was the 100 percent beneficial owner of GunBroker. (*Id.*, Vol. II at 98:15-18.) According to Tenor, the Ammo deal and the MGG loan, taken together, show that Urvan's primary motivation in engaging Tenor was not to reward GunBroker's employees with equity but to enable him to extract cash from the business. (Pl.'s Br. in Opp'n to Def.'s Mot. for a New Trial, at 16-17; Trial Tr., Vol. V at 76:18-77:4.) Tenor's financing activities, Tenor argues, accomplished that goal for Urvan.[3] (Pl.'s Br. in Opp'n to Def.'s Mot. for a New Trial, at 16.)

---

[3] For its part, GunBroker does not even attempt to rebut Tenor's relevance arguments in its reply brief. (Reply Br. in Supp. of Def.'s Mot. for a New Trial, at 8-9.)

Finally, the Court is not persuaded that this evidence introduced prejudice against Urvan regarding his wealth or personal character. A court may exclude evidence under Rule 403 "if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" Fed. R. Evid. 403. Because Rule 403 allows a trial court to exclude probative evidence, it is an "extraordinary remedy" and "should be used only sparingly"; "[t]he balance under the Rule, therefore, should be struck in favor of admissibility." *Smith*, 459 F.3d at 1295 (citation and alteration omitted). But Urvan himself volunteered information about his personal finances on the witness stand: for example, responding that he owned homes in multiple states to a question about his residency. (Trial Tr., Vol. II at 96:6-8.) And even GunBroker questioned Urvan at length about the Ammo deal, including the value added by the MGG loan's prepayment provision and the other drivers behind GunBroker's $244 million valuation. (*Id.*, Vol. IV at 77:4-22, 152:15-155:18.) In its closing argument, GunBroker also described Urvan as a "Georgia boy who made himself rich"—specifically richer than Butler and Schnabl. (*Id.*, Vol. V at 38:4-21, 39:18-24.) On this record, the Court cannot say that the complained-of evidence had a prejudicial impact such that its introduction was error under Rule 403. *See Myers v. TooJay's Mgmt. Corp.*, 640 F.3d 1278, 1287 (11th Cir. 2011) ("[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." (citation omitted)).

25

### iii. GunBroker's Proposed Jury Charges Nos. 41 and 42

Next, GunBroker argues that the Court erred in declining to give its Proposed Jury Charges Nos. 41 and 42. (Def.'s Mot. for a New Trial, at 15-17.) Both were related to the method for measuring damages on an unjust enrichment claim. The first requested charge provided that:

> The value of services is not determined from the perspective of the party rendering the services, but must be determined from the perspective of the recipient to determine to what extent the party was benefited or enriched by such services; otherwise, ineffective, defective or worthless services could create liability for the recipient. The value of the services from the perspective of the recipient is uniquely that of opinion and if [sic] for you, the jury, to determine as to value, if any.

(Def.'s Requests to Charge [Doc. 177], at 59.) The second provided that:

> Particularly in claims for equitable damages, the mere fact that a party did not perform as required or expected standing alone does not furnish a basis upon which the amount of the loss can be calculated. An allowance for damages cannot be based on guess work.

(*Id.* at 60.) In the Court's view, these proposed charges are merely duplicative of the instructions that were in fact given to the jury. *See United States v. Webb*, 655 F.3d 1238, 1249 n.8 (11th Cir.2011) (explaining that a district court's refusal to give a requested instruction is reversible "only if . . . the requested instruction was not addressed in the charges actually given"). The Court's actual instructions read in relevant part:

> The measure of damages under unjust enrichment is based upon *the benefit conferred upon the recipient* and not the cost to render the service or cost of goods. . . . Where a party sues for damages, the party has the burden of proving the amount of the loss in a

26

manner that the jury can calculate the amount of the loss *with a
reasonable degree of certainty*.

(Trial Tr., Vol. V at 88:22-24, 89:4-7 (emphasis added).) The Court addressed
the two principles reflected in GunBroker's Proposed Jury Charges Nos. 41 and
42: namely (1) the value of the underlying goods or services must be measured
from the recipient's perspective, and (2) the plaintiff must prove (and the jury
must calculate) the amount of damages with reasonable certainty, not by
guesswork. GunBroker's preferred charges would have provided no better
guidance on "how to determine the value of the benefit conferred"; instead, they
risked confusing the jury by assuming, for example, that some unspecified
party did not perform as required or expected.[4] (Def.'s Mot. for a New Trial, at
15.) This quibble from GunBroker does not warrant a new trial.

### iv. The Court's Investment Advisers Act Charge

On the fifth and final morning of trial, the Court filed and presented to
the parties a proposed Investment Advisers Act Charge with the following
language:

> The Investment Advisers Act defines an "investment adviser" as
> any person who, for compensation, engages in the business of
> advising others, either directly or through publications or
> writings, as to the value of securities or as to the advisability of
> investing in, purchasing, or selling securities, or who, for
> compensation and as part of a regular business, issues or
> promulgates analyses or reports concerning securities. An
> investment advisor as so defined is required to be registered

---

[4] The fact that the jury awarded Tenor substantially more than it
requested is not evidence to the contrary. (Def.'s Mot. for a New Trial, at 16.)

under the Act. Any contract entered into in violation of the Act is void. I have ruled in this case that the Plaintiff Tenor Capital Partners was required to register under the Act in order to advise GunBroker.com on the sale of securities in the company to an ESOP. Therefore, the contract between Tenor Capital Partners and GunBroker.com for Tenor to provide such services was void. Tenor contends that the services that are the subject of Tenor's unjust enrichment claim that conferred a benefit upon GunBroker did not involve advising as to the value of securities or the advisability or [sic] investing in, purchasing, or selling securities. Nor do they involve promulgating analyses or reports concerning securities. The Investment Advisers Act does not require registration by a firm arranging financing for an ESOP transaction. Therefore, providing such services by an unregistered firm would not be illegal.

(Court's Additional Jury Instruction [Doc. 189], at 1.) During the charge conference, GunBroker objected to this instruction on two grounds. First, GunBroker asked the Court to substitute the phrase "Nor do they involve" with "Tenor contends that the services do not involve" in the third-to-last sentence; the Court accepted that change. (Trial Tr., Vol. V at 19:17-23, 20:5-7.) GunBroker also objected to the final sentence, arguing based on *Five Star Athlete* that "if the legal act requires any aid from the illegal portion [of the contract], th[en] you cannot proceed." (*Id.*, Vol. V at 19:24-20:4.) The Court declined to amend the charge in response to that objection. (*Id.*, Vol. V at 20:8.) The Court did, however, add a sentence directing the jury to accept "as the law of the case" that the contract between Tenor and GunBroker to provide investment advisory services was void. (*Id.*, Vol. V at 22:21-:23:1.) When the court asked GunBroker's counsel whether that change satisfied him, he responded "yes." (*Id.*, Vol. V at 23:2-3.)

28

Now, GunBroker argues that the Court made three errors in the Investment Advisers Act Charge, mandating a new trial. First, because the parties did not learn about the charge until the last day of trial, GunBroker claims that it was unable to present its case with the "benefit of understanding how the Court intended to charge the jury." (Def.'s Mot. for a New Trial, at 17.) But the Federal Rules of Civil Procedure specifically contemplate that jury instructions may change during the course of trial. Under Rule 51, the parties are allowed to request instructions from the court until—and, under some circumstances, even after—the close of evidence. Fed. R. Civ. P. 51(a). GunBroker itself took advantage of this rule, submitting four supplemental charges with the Court on the second-to-last day of trial. (Def.'s Supplemental Proposed Requests to Charge [Doc. 185], at 3-6.) Meanwhile, the district court's obligation is to inform the parties of its proposed instructions "before instructing the jury and before final jury arguments." Fed. R. Civ. P. 51(b)(1). Given that the parties received the Investment Advisers Act Charge before the close of evidence and were able to raise objections to it during the charge conference, the instruction plainly complied with Rule 51's procedural requirements.

Second, GunBroker argues that the Investment Advisers Act Charge, as delivered, was not an accurate statement of Georgia law. (Def.'s Mot. for a New Trial, at 18.) In GunBroker's view, the Court should have instructed the jury to consider whether Tenor's financing activities were "aided" by its illegal

29

investment advice and whether that investment advice was "collateral" or "remotely connected" to the "essence" of the void Letter Agreement. (*Id.*) Third, and relatedly, GunBroker argues that the Investment Advisers Act Charge usurped a fact issue from the jury by assuming that Tenor's financing activities were distinct from its investment advice. (*Id.*) In general, district courts "have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts." *United States v. Williams*, 526 F.3d 1312, 1320 (11th Cir. 2008) (citation omitted). As opposed to general or abstract charges, there is a "distinct preference, particularly in complex cases, for instructions that relate the law to the evidence presented by the parties." 9C Charles Wright & Arthur Miller, Federal Practice and Procedure § 2556 (3d ed. Apr. 2022 update); *King v. Allstate Ins. Co.*, 906 F.2d 1537, 1543 (11th Cir. 1990) ("We and other Courts have held that the duty is to give instructions which are meaningful and translated—not in terms of some abstract case—but into the facts of this particular case." (citation omitted)). To that end, courts need not give an instruction on a matter that was not effectively raised at trial or is not supported by the evidence. 9C Wright & Miller, Federal Practice and Procedure § 2556; *see also Costa v. Desert Palace, Inc.*, 299 F.3d 838, 856 (9th Cir. 2002) ("After hearing both parties' evidence, the district court must decide what legal conclusions the evidence could reasonably support and instruct the jury accordingly."). Rather, "[j]ury instructions should be given only if they are supported by competent evidence." *FDIC v. UMIC, Inc.*, 136 F.3d 1375, 1382

(10th Cir. 1998).

These principles, the Court finds, counsel against GunBroker's proposed amendments to the Investment Advisers Act Charge. In drafting the charge, the Court sought to translate *Five Star Athlete*'s "any-aid" test into the facts of this case. As explained herein and in the May 23rd Order, Tenor did not require any aid from its investment advice to make out the elements of unjust enrichment. So, in the Court's view, there was no issue of fact as to whether Tenor's unjust enrichment claim could be enforced apart from the void Letter Agreement. And in turn, the trial evidence did not warrant a jury charge on the "any-aid" test (or GunBroker's newly minted "contractual-essence" test). By contrast, the language now proposed by GunBroker would have risked confusing the jury by introducing unneeded complexity, such as the illegality of Tenor's investment advice, into their deliberations. *See United States v. Mayweather*, 991 F.3d 1163, 1183 (11th Cir. 2021) (noting that "a district court may refuse to give a confusing jury instruction"). The Investment Advisers Act Charge was meant to avoid such confusion, especially after the parties extensively discussed federal securities laws—and at times, misrepresented the Court's analysis of those laws—at trial. (Trial Tr., Vol. II at 6:12-8:12; *id.*, Vol. III at 142:15-152:19.; *id.*, Vol. IV at 9:13-11:14, 155:19-158:20.)

During the charge conference, GunBroker also objected to the Court's decision not to give GunBroker's Proposed Jury Charge No. 37. (*Id.*, Vol. V at 23:9-10.) The charge in question provided that:

31

> If an express agreement is unenforceable and void because it violates some public policy, the agreement cannot be made legal and binding as an implied contract, by praying for recovery on a theory of unjust enrichment.

(Def.'s Requests to Charge [Doc. 177], at 55.) The Court rejected this language "based on my reading of the *Five Star Athlete* case" (Trial Tr., Vol. V at 23:9-10 (emphasis added)), and GunBroker maintains that the charge was proper and should have been delivered along with some version of the "any-aid" test. (Def.'s Mot. for a New Trial, at 19-20.) The Court disagrees. GunBroker's proposed charge paints an incomplete and misleading picture of Georgia law. In particular, it does not account for the rule that "where a contract is illegal only in part, recovery is allowed on a quantum meruit basis for the part of the services which was legal." *Remediation Servs.*, 209 Ga. App. at 434. On the other hand, the Investment Advisers Act Charge gave a more holistic account of the relevant legal principles, explaining that the agreement between Tenor and GunBroker to provide unregistered investment advice was void but that the financing activities at the heart of Tenor's unjust enrichment claim do not require registration under the Investment Advisers Act and thus are not illegal. Again, GunBroker's Proposed Jury Charge No. 37 would have only introduced redundancy and confusion into the jury's deliberations.

## C. Motion to Alter or Amend the Judgment

The last of GunBroker's post-trial motions seeks to reduce the jury verdict on Tenor's unjust enrichment claim.[5] (Def.'s Mot. to Alter or Amend the Judgment, at 1-2.) According to GunBroker, the $1.5 million award was excessive in light of the evidence and should be reduced to no more than $975,000—that is, the amount requested by Tenor at trial. (*Id.* at 1-3.) Although a federal court has no general authority to reduce the amount of a jury's verdict, it may order a new trial when the damages award exceeds the outer limits of the evidence. *See Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1328 (11th Cir. 1989); *see also Carter v. DecisionOne Corp. Through C.T. Corp. Sys.*, 122 F.3d 997, 1006 (11th Cir. 1997) ("A new trial should be ordered only when the verdict is so excessive as to shock the conscience of the court."). "A federal court's power to 'order' a remittitur grew out of this authority to grant a new trial. A court which believes the jury's verdict is excessive may order a new trial unless the plaintiff agrees to remit a portion of the jury's award." *Johansen*, 170 F.3d at 1328. The choice between a new trial and remittitur lies with the plaintiff; if the plaintiff does not consent to the remittitur, the court's only alternative is to order a new trial. *See id.* at 1329.

---

[5] In the Motion to Alter or Amend the Judgment, GunBroker also requests a new trial, citing the same allegations of juror misconduct that appeared in the Motion for a New Trial. (Def.'s Mot. to Alter or Amend the Judgment, at 3-12.) The Court has already rejected those arguments and need not repeat that analysis here.

At trial, Tenor claimed that it was entitled to $975,000 for its financing work (*i.e.*, the 1.5 percent success fee under the Letter Agreement) as well as $650,000 in attorney's fees. The jury found in Tenor's favor solely on unjust enrichment and not on attorney's fees. However, GunBroker speculates that the jury, in fashioning the $1.5 million damages award, "simply added the amount of claimed attorney's fees into the award regarding the benefit conferred by Tenor . . . upon GunBroker." (Def.'s Mot. to Alter or Amend the Judgment, at 14.) According to GunBroker, the jury probably opted for this approach either to wrap up their deliberations before the weekend or to *de facto* award attorney's fees to Tenor even though the evidence did not support such a verdict. (*Id.*) There is, of course, one major hole in GunBroker's theory: $975,000 plus $650,000 does not equal $1.5 million, but $1.625 million. Whereas GunBroker may be content to grasp at straws in deciphering (and impugning) the jury's intent, the Court is not.

Beyond GunBroker's suspect math, the Court agrees with Tenor that the trial evidence could reasonably support a greater award than $975,000. (Pl.'s Br. in Opp'n to Def.'s Mot. to Alter or Amend the Judgment, at 14-15.) Butler testified that the $65 million MGG loan included "significantly better terms" than GunBroker's existing debt, saving the company about $1.5 million in interest each year. (Trial Tr., Vol. I at 98:22-99:14; *id.*, Vol. II at 17:10-18:13.) Butler also described Tenor's efforts to negotiate a lower prepayment penalty into the loan, which promised to save GunBroker up to $4.5 million depending

34

on how soon the business was sold. (*Id.*, Vol. I at 163:18-164:15.) Schnabl testified to the same effect. He explained that the revised prepayment provision was potentially worth millions of dollars to GunBroker and noted other beneficial loan terms, such as the reduced origination fee from 3 to 2.5 percent. (*Id.*, Vol. III at 24:22-26:18.) Even though Tenor never asked the jury to award more than $975,000, Tenor stated at closing arguments that "one could argue that Tenor should be paid more than $975,000 if you just calculate it on the benefit that GunBroker received[.]" (*Id.*, Vol. V at 82:5-7.) In response, GunBroker disparages the above evidence as "self-serving testimony" that reflects the value of Tenor's services from Tenor's perspective, not GunBroker's perspective. (Reply Br. in Supp. of GunBroker's Mot. to Alter or Amend the Judgment, at 9-10.) But the jury was surely allowed to consider this evidence in its damages calculation, especially since GunBroker maintained throughout trial that Tenor's services were worthless. In short, the Court is satisfied that the verdict was "within the bounds of possible awards supported by the evidence" and should not be disturbed. *Carter*, 122 F.3d at 1006.

Finally, the Court declines to reduce the verdict based on the vague "principles of equity" referenced by GunBroker. (Def.'s Mot. to Alter or Amend the Judgment, at 15.) According to GunBroker, Tenor should not be allowed to recover more on an unjust enrichment claim than it could have under the void Letter Agreement. (*Id.*) In support, GunBroker cites O.C.G.A. § 23-1-6, which states that "equity follows the law where the rule of law is applicable and

35

follows the analogy of the law where no rule is directly applicable." (*Id.* (citing O.C.G.A. § 23-1-6).) Here, there is directly applicable law as to how a jury should calculate damages under unjust enrichment, and the Court properly instructed the jury on that law. (Trial Tr., Vol. V at 88:22-89:7.) As even GunBroker proposed in its charge requests, the value of services "must be determined from the perspective of the recipient to determine to what extent the party was benefited or enriched by such services." (Def.'s Requests to Charge, at 59.) Evidently, the jury determined that GunBroker derived more value from Tenor's financing activities than the price agreed upon in the Letter Agreement. During trial, GunBroker never requested a jury instruction capping the potential damages at the contract's terms; to the contrary, GunBroker has insisted throughout this litigation, including in its other post-trial motions, that the Letter Agreement is void and cannot be used to support Tenor's unjust enrichment claim. Now, the Court will not sanction GunBroker's about-face where the Letter Agreement would serve its own ends.[6]

---

[6] GunBroker also relies on Restatement (Third) of Restitution and Unjust Enrichment § 50 (Am. L. Inst. Oct. 2022 update) to argue that as an "innocent recipient," it should not be made to bear a higher price than it "has expressed a willingness to pay." (Def.'s Mot. to Alter or Amend the Judgment, at 16.) But GunBroker identifies no Georgia cases which have adopted this section of the Restatement. Nor did GunBroker request a jury instruction on the definition of an "innocent recipient," so the Court cannot say whether this principle, even if recognized under Georgia law, would apply to GunBroker.

## IV.    Conclusion

For the foregoing reasons, the Court DENIES the Defendant's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial [Doc. 200], DENIES the Defendant's Motion for a New Trial [Doc. 201], and DENIES the Defendant's Motion to Alter or Amend the Judgment [Doc. 202].

SO ORDERED, this ____21st____ day of October, 2022.

THOMAS W. THRASH, JR.
United States District Judge

37